UNITED STATES of America, Plaintiff–Appellee,

v.

Frank J. GARNER and Lindira M. Hubbard, Defendants–Appellants

Nos. 00–4395, 00–4409.

United States Court of Appeals, Sixth Circuit.

Sept. 5, 2002.

Before DAUGHTREY and CLAY, Circuit Judges; and WILLIAMS, Senior District Judge.*

WILLIAMS, Senior District Judge.

Lindira M. Hubbard ("Hubbard") appeals from his conviction for possession with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2 and for the use and carrying of a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1). Frank J. Garner ("Garner") appeals from his guilty plea to a charge of possession

---

* The Hon. Glen M. Williams, Senior United States District Judge for the Western District of Virginia, Abingdon Division, sitting by designation.

with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2. Hubbard and Garner raise a number of challenges to their convictions and sentences. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

The convictions of Hubbard and Garner stem from events occurring on May 16, 2000. Cleveland Police Officer Joseph O'Neill ("O'Neill"), a motorcycle patrolman, pulled over a 1998 Ford Expedition lacking a front license plate at approximately 11:50 a.m. (J.A. at 354–55.) Hubbard was the driver, and Garner was in the passenger seat. (J.A. at 356.) After stopping the vehicle, O'Neill approached the driver and asked for his driver's license. (J.A. at 357.) Hubbard responded that he did not have a driver's license, that the vehicle belonged to Khaleel Haqq, that he was taking Garner to work, and that there was possibly a warrant for his (Hubbard's) arrest. (J.A. at 357.) Thereafter, O'Neill took Hubbard's name and social security number down and returned to his motorcycle to run the vehicle plates and the driver's information. (J.A. at 358.)

The dispatcher informed O'Neill that the vehicle belonged to Sylvester Harris, who was currently incarcerated, that Hubbard did not have a valid driver's license, and that he had no outstanding warrants. (J.A. at 358.) At this point, O'Neill requested that backup be sent to assist him. (J.A. at 358–59.) O'Neill testified at Hubbard's hearing on his motion to suppress that he asked the vehicle occupants to remain in the vehicle while he checked on the information he had received. While O'Neill was on the radio, Hubbard stated that Garner needed to go to work. O'Neill told him to wait, that "it [would] only be a few more minutes." (J.A. at 232.) Hubbard began honking his horn to get the officer's attention and again requested that Garner be allowed to go to work. (J.A. at 233.) Garner attempted to get out of the car, and O'Neill told him to wait in the car for a few more minutes. (J.A. at 233.) Garner again opened his door, looked back at O'Neill and stated that he needed to go to work, and, again, O'Neill told him to wait. Garner persisted, and O'Neill testified that rather than risk a confrontation, he told Garner to go ahead and leave. (J.A. at 234.) O'Neill gave similar testimony at trial, stating, "Then the passenger got out of the car again, and I'm by myself, behind the vehicle, and I just told them, that's fine. Just go." (J.A. at 359.) At this point, Garner exited the vehicle, grabbed a black gym bag and began to walk down the street. (J.A. at 234, 359.)

Hubbard's and Garner's versions of these events differ somewhat from the government's version. According to Hubbard, once O'Neill returned from running the personal information and plates, Garner asked if he could get out and go to work, and O'Neill responded, "Go ahead." (J.A. at 286.) Garner's testimony was essentially the same. (J.A. at 294.)

Shortly thereafter, Cleveland Police Officer Paul Wilson ("Wilson") arrived to assist O'Neill. O'Neill told Wilson to go stop Garner and return him to the scene of the traffic stop. (J.A. at 360, 365.) Wilson pulled his police car alongside Garner, who was approximately 200 feet from the scene of the traffic stop, exited the vehicle and walked up to Garner. (J.A. at 366–67.) Garner was still carrying the black gym bag and, according to Wilson, visibly shaking. (J.A. at 367.) Wilson identified himself and informed Garner that O'Neill wanted him back at the traffic stop. Garner did not respond. (J.A. at 367.) Again Wilson asked Garner to return to the traf-

fic stop with him, and also asked him what was in the bag. (J.A. at 367.) When asked at trial why he questioned Garner about what was in the bag, Wilson responded, "I check everybody's bag, purse, that sits behind me, so I know for their safety and my safety. And plus I want to arrive home to my family. I wouldn't want to be shot in the back or nothing." (J.A. at 367–68.)

Garner responded to the question that he had found the bag along the railroad tracks and that the bag contained jewelry or drugs. (J.A. at 368.) Wilson then grabbed Garner with his left hand around Garner's right bicep, escorted him to the car and opened the rear passenger door where Garner sat down with his feet on the sidewalk. Wilson then took the bag and stated, "[L]et's open this bag and see what's in it." (J.A. at 267, 368.) Garner made no response. (J.A. at 369.) Wilson unzipped the bag in front of Garner, and both looked in the bag. There, Wilson observed seven bags vacuum-wrapped in brown packaging tape that appeared to be drug packages. Wilson advised Garner that he was under arrest at that time and not to speak to him. (J.A. at 368–69.) Wilson placed Garner in the rear of the car without handcuffing him, placed the bag in the front passenger floorboard of the car and returned to the scene of the traffic stop. (J.A. at 369.)

At the suppression hearing, Garner's explanation differed from that of Officer Wilson. According to Garner, he found the bag alongside the railroad tracks. He stated that he did not know the bag contained drugs. (J.A. at 303.) Garner stated that a few days prior to this incident, he was riding with Detective Johnson of the East Cleveland Police Department when they came across a Jamaican who said he had been robbed of a bag fitting the description of the bag Garner found. (J.A. at 304.) Detective Johnson reportedly told Garner that if he found the bag, to let him know. (J.A. at 304.) Garner stated that he was on his way to see a lawn care client and intended to call Johnson from there. (J.A. at 304–05.)

Wilson informed O'Neill of what he had found. The two officers then decided to approach the vehicle. (J.A. at 370.) Because of the drug discovery, the officers drew their sidearms. (J.A. at 361–62, 370.) Wilson approached the driver's side of the vehicle, and O'Neill approached from the passenger's side. (J.A. at 361, 370.) Wilson opened the door to the car, asked Hubbard to step out and face the truck and get on his knees. (J.A. at 370.) O'Neill came around from the other side. Hubbard stated that he was carrying a gun on his right hip. (J.A. at 362–63, 371, 398.) O'Neill removed a loaded Star .45-caliber semi-automatic handgun and extra loaded magazine from a black nylon belt designed to secure a weapon underneath a person's pants. (J.A. at 363.)

At this point, other officers arrived at the scene. Garner and Hubbard were advised of their constitutional rights and placed under arrest. (J.A. at 273–74.) Detective Ronald Ross ("Ross") of the Caribbean Gang Drug Task Force arrived and searched the truck where he found mail addressed to Khaleel Haqq. (J.A. at 375.) Garner and Hubbard were transported to Sixth District Police Department for further processing. (J.A. at 373.) At the police station, O'Neill issued a ticket to Hubbard for failure to display a front license plate, not wearing a seat belt and driving without a valid license. (J.A. at 243.) He issued a ticket to Garner for failure to wear a seatbelt. (J.A. at 244.)

While at the station, Garner and Hubbard were again advised of their constitutional rights and interviewed. (J.A. at 280–81.) Garner waived his rights and

agreed to make a statement to Ross and Detective Thomas Williams. (J.A. at 90.) Ross testified that Garner stated in that interview that he was walking by the railroad tracks and found the black duffel bag. (J.A. at 281.) Garner stated that he looked inside the bag and thought it contained either drugs or money. (J.A. at 281.) He then continued walking, carrying the bag with him, to St. Clair Avenue where he got a ride with Hubbard. (J.A. at 281.) According to Ross, Garner initially stated that they were on their way to a scrap yard, then changed his story, stating that he and Hubbard were going to the East Cleveland Police Department to turn the bag over to a Detective Brown. (J.A. at 281.) When asked why they were traveling away from the police station, Garner could not provide an explanation and ended the interview. (J.A. at 281–83.) Williams testified that the interview lasted approximately 25 minutes and that Garner never asked for a lawyer. (J.A. at 94–95.) At his suppression hearing, Garner testified that he was interviewed by six people. (J.A. at 312.) He further stated that he twice requested a lawyer and made no statement whatsoever. (J.A. at 312–315.)

Hubbard likewise waived his rights and made a statement to Detectives Mike Gray and Ron James in an interview that began between 5:15 p.m. and 5:30 p.m. and lasted approximately two hours. (J.A. at 334.) According to James, Hubbard initially denied any knowledge of Garner or the contents of the bag, but after the detectives stated that they did not believe him and gave Hubbard certain assurances that his street reputation would not be harmed, Hubbard became more cooperative. (J.A. at 379–80.) According to James, Hubbard stated that he was the "number-two man" in a much larger drug trafficking organization that included Khaleel Haqq ("Haqq"), Kent Harris, Leamon Eddie ("Eddie"), also known as "Buddha," and others.

Hubbard identified himself as the "enforcer" because of his large physical size and further identified Haqq as the leader of the group. (J.A. at 380–81.) Hubbard stated he had received instructions to pick up Garner with the cocaine. Together, they met Kent Harris and gave him five kilograms of cocaine. They then were on their way to meet another man to distribute six kilograms of cocaine when they were stopped by the police. (J.A. at 382–83.)

At his suppression hearing, Hubbard denied making any statement to anyone of the sort detailed above. (J.A. at 337.) He admitted knowing Kent Harris and Haqq, but denied any knowledge of drug dealing. (J.A. at 337.) Hubbard did acknowledge that both he and Garner were advised of their constitutional rights both at the scene of the traffic stop and at the police station. (J.A. at 337.) The court determined that Hubbard was not coerced in any manner and concluded that the statement made by him should not be suppressed. (J.A. at 339–40.)

On June 14, 2000, a grand jury indicted Hubbard and Garner for possession with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2 ("Count One"). (J.A. at 23.) Hubbard also was indicted for the use and carrying of a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1). Garner pled guilty to the charges against him, (J.A. at 181–88), but Hubbard pled not guilty and proceeded to trial. (J.A. at 60–61.)

Garner moved to suppress the evidence seized and the statements made during his encounter with Wilson as well as the statements made during his subsequent detention. (J.A. at 71–78.) The court denied this motion on July 19, 2000. (J.A. at 163–

72.) It determined that Wilson had probable cause to arrest "because [Garner] failed to comply with a lawful police order." (J.A. at 167.) The court also justified Garner's detention under the auspices of a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), finding that Wilson had reasonable suspicion sufficient to detain Garner. (J.A. at 168–69.) Regarding the search of Garner's duffel bag, the court determined that the search was permissible as either a search incident to an arrest, (J.A. at 169), or, if the detention of Garner was viewed as less than a full custodial arrest, as a protective search under *Terry* and its progeny. (J.A. at 170–71.) Finally, the court determined that Garner's statements made while in detention were admissible. The court found that Garner's testimony at the hearing was "implausible" and "self-serving." (J.A. at 172.) The court, therefore, credited the testimony of the officers as being much more credible and allowed the evidence to be presented. (J.A. at 172.)

Following Garner's motion for reconsideration, (J.A. at 194–201), the district court further clarified its previous position. Garner sought to focus the court's attention on O'Neill's release of Garner from the vehicle. The court discounted this fact, however, stating that "Garner fails to realize that Officer O'Neill's approval did not innoculate him from liability for his earlier refusal to comply with O'Neill's order to remain in the vehicle." (J.A. at 217.) The court also reiterated its previous reasoning that even if it had erred in finding probable cause, Wilson was still justified in his search under *Terry*.

At Hubbard's trial, O'Neill, Wilson, Ross and James testified to the facts detailed above. In addition, Special Agent Robert Fiatal, Caribbean Gang Drug Task Force supervisor, testified that Haqq, Eddie, and Kent Harris had been under investigation by the task force since late 1999 or early 2000. (J.A. at 385–86.) Garner and Hubbard also testified, both restating their testimony substantially as given during the suppression hearings, i.e., neither was aware that the bag contained drugs, nor was either aware of any drug trafficking activity. The parties stipulated that the amount of cocaine at issue was 6,992.8 grams. (J.A. at 421–422.) The jury found Hubbard guilty on both counts. (J.A. at 192.)

The court sentenced Hubbard to concurrent sentences of 262 months on the drug charge and 60 months on the weapons charge on October 19, 2000. (J.A. at 32.) Hubbard was given a three-level enhancement under U.S. Sentencing Guidelines ("U.S.S.G.") § 3C1.1(a) for his aggravating role in the offense and a two-point enhancement for obstruction of justice under U.S.S.G. § 3C1.1(a) for giving perjured testimony. (J.A. at 436–39.) Garner was sentenced to a term of 121 months on the drug charge. (J.A. at 26.)

Garner now appeals solely on the issue of his denied motion to suppress the cocaine seized during the search of the duffel bag he had with him. Hubbard alleges the district court erred in unconstitutionally denying him his right to counsel of choice. Hubbard also alleges ineffective assistance of counsel. Hubbard further contends that he was denied a fair trial due to prosecutorial misconduct and the admission of evidence concerning other individuals mentioned in his confession, a confession Hubbard alleges was made as a result of undue delay in bringing him before a magistrate judge and, therefore, should have been excluded. Hubbard also argues that the government failed to produce adequate proof of an effect on interstate commerce at his trial. Hubbard also challenges the district court's instruction of the

jury. Finally, Hubbard alleges that sentencing enhancements were made in violation of *Apprendi* and without any evidentiary support.

## II. ANALYSIS

We first turn to Garner's sole assignment of error, the district court's denial of his motion to suppress the cocaine discovered in the duffel bag. On appeal, the court reviews the district court's findings of law *de novo* and findings of fact for clear error. *United States v. Matthews*, 278 F.3d 560, 561 (6th Cir.2002).

Garner urges on appeal, as he did below, that the stop and search of his person and duffel bag were lacking the requisite probable cause. Further, he argues that the stop by Wilson lacked even the reasonable suspicion necessary to perform a stop and protective frisk. Garner relies heavily on the fact that O'Neill effectively gave Garner permission to leave. Much is also made of the fact that O'Neill issued a ticket for a seat belt violation well after the defendant had been taken to the police station and from a different ticket book than the one issued to Hubbard for the same offense, the inference being that the ticket was an afterthought written to justify the stop by Wilson.

The government, echoing the justifications offered by the district court, argues that O'Neill was well within the limits of the law by requiring all of the passengers to remain in the car. The government cites *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), in support of this proposition. In *Wilson* the Supreme Court held that a police officer's ordering of a driver and passengers within a car to exit during a traffic stop was not an unreasonable intrusion on Fourth Amendment rights, considering the greater danger to the officer when passengers are present. 519 U.S. at 414–15. The

implication, of course, is that the reverse is true also, that requiring passengers to remain in the car for the safety of the officer is not unreasonable. The government further cites *United States v. Moorefield*, 111 F.3d 10 (3d Cir.1997), in support. There, the Third Circuit, citing *Wilson*, held that a police officer's order to remain in the car was not unreasonable.

Finally, the government cites Ohio statutes making failure to comply with the lawful order of a police officer a first degree misdemeanor and an offense for which a person may be arrested. *See* Ohio Rev. Code §§ 2921.33(A) & 2935.03(A) (West 2002). The government argues that Garner's exiting the vehicle and leaving the scene gave O'Neill, and through him, Wilson, the necessary probable cause to arrest Garner. Therefore, the search of the bag was incident to Garner's lawful arrest.

In the alternative, the government argues that the stop and search of Garner is justified under *Terry*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. The government states that Wilson had a reasonable and articulable suspicion that Garner either had been, was, or was about to be involved in criminal activity. This suspicion, according to the government, justified stopping Garner and performing a protective search.

Reasonable suspicion, just as probable cause, is determined from the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). However, in developing a reasonable suspicion that criminal activity is occurring, an officer must have more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. Furthermore, "[r]easonable suspicion can be based upon police officers' own observations or upon the collective knowl-

edge of other officers." *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir.1994).

In *Terry*, the Court held that an individual may be stopped and frisked for weapons if an officer, based on his observations and experience, determined that an individual is, was or will be engaged in criminal activity. 392 U.S. at 30. This protective search has since been expanded to include areas within the immediate control of a suspect. *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Areas within the immediate control of a suspect include the entire passenger area of a vehicle, including any packages or containers without regard for whom may own the packages or containers. *Wyoming v. Houghton*, 526 U.S. 295, 302, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999).

■ With these principles in mind, we turn to the facts of this case. Much is made, both by the government and the district court, of Garner's departure from the scene of the traffic stop. The district court discounts the fact that O'Neill gave Garner permission to leave, albeit after much badgering by Garner and after having told him three times to remain in the car. O'Neill justified this action by testifying that he did not want to risk a confrontation with two suspects alone. The district court accepts this rationale, stating, "Garner fails to realize that Officer O'Neill's approval did not innoculate him from liability for his earlier refusal to comply with O'Neill's order to remain in the vehicle."

We believe the district court's justification requires too much from a suspect. O'Neill could have changed his mind and decided to let Garner go to work, as Garner claimed he needed to do. The district court would have a suspect read the inner workings of the mind of a police officer to determine the reason that officer says or does a particular thing. Therefore, the district court's reasoning that Garner had violated an Ohio statute by disobeying a lawful order of a police officer, thus, entitling the officer to place Garner under arrest, is faulty.

■ However, other facts, objectively viewed, do give rise to a finding of reasonable suspicion warranting a stop of Garner. O'Neill was aware that Garner urgently wanted to leave, regardless of the reason given. He also was aware that Garner was accompanying a driver who was not the owner of the vehicle, that the vehicle's actual owner was in jail, and that the driver had no license. Also, the driver, Hubbard, had stated that there may be a warrant outstanding for his arrest. O'Neill was unaware of any bag until Garner removed it from the vehicle to carry it with him.

Based on these facts, O'Neill had reasonable suspicion sufficient to stop Garner. Furthermore, this reasonable suspicion was transferred to Wilson upon his arrival at the scene, *see Braggs*, 23 F.3d at 1049, and O'Neill's instruction to return Garner to the traffic stop. As Wilson approached Garner on the sidewalk, he noted that he was visibly shaking. Garner initially failed to respond to the officer. Also, when asked what was in the bag, Garner voluntarily responded jewelry or drugs.

■ Contrary to the district court's reasoning that the officer acquired probable cause to arrest based on Garner's departure from the scene of the traffic stop, we find that Wilson acquired probable cause to arrest Garner based on his statement concerning the contents of the bag. " '[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the cir-

cumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *see also Sandul v. Larion,* 119 F.3d 1250, 1256 (6th Cir.1997) (holding that "[a] police officer is permitted to make an arrest if there is probable cause to believe that the arrestee has committed or is committing an offense.") Garner's statement clearly indicated that he was in possession of some sort of illegal contraband, giving the police officer probable cause to take him into custody. Wilson took possession of the bag and placed Garner in the back of his police cruiser.

Because of the arrest, the search of the bag is permissible as a search incident to an arrest. This circuit has recently addressed a similar situation in *Northrop v. Trippett,* 265 F.3d 372 (6th Cir.2001). In that case, the court upheld the search of a duffel bag police had observed Northrop place under a seat at a bus station. In so doing the court stated, "[T]he right to search an item incident to arrest exists even if that item is no longer accessible to the defendant at the time of the search. So long as the defendant had the item within his immediate control *near* the time of his arrest, the item remains subject to a search incident to arrest." 265 F.3d at 379 (citations omitted) (emphasis added). Therefore, the ruling of the district court denying Garner's motion to suppress is affirmed, although based on a different reasoning.

■ Hubbard's first assignment of error is that he was denied his Sixth Amendment right to counsel of choice when the district court denied his motion to substitute counsel. The court reviews such claims for a district court's abuse of discretion. *See United States v. Williams,* 176 F.3d 301, 314 (6th Cir.1999). In doing so, the court considers several factors: "time-

liness of the motion; adequacy of the district court's inquiry into the matter; the extent of the conflict between the attorney and client and whether it resulted in a total lack of communication; and a balancing of these factors with the public's interest in the prompt and efficient administration of justice." *Williams,* 176 F.3d at 314 (internal quotations and citations omitted).

Hubbard was represented by attorney James C. Young ("Young") at his arraignment and through his trial. Attorney Paul Mancino ("Mancino") filed a conditional entry of appearance on July 25, 2000, only six days before trial, his appearance conditioned on the trial court granting a continuance to allow Mancino to properly prepare. (J.A. at 173–176.) At his suppression hearing, Hubbard told the court he wanted to fire Young and replace him with Mancino. (J.A. at 322.) He further stated that Mancino was unavailable due to other trial obligations, but that the court should have received "a motion." (J.A. at 322.) The court acknowledged receipt of the conditional entry of appearance, and stated that Mancino could represent Hubbard, but that there would be no continuance based on "the fact that [Hubbard had] been through . . . at least three attorneys already." (J.A. at 322.)

At this point, Hubbard stated that he and Young had not worked on the case together very much, only meeting two or three times. (J.A. at 323.) Young vigorously disputed this, calling it "totally untrue," (J.A. at 323.), and stating that he had met with Hubbard no less than six times. Hubbard stated that it was his belief that Young's law license had been suspended, to which the court responded, "He's not, so you are wrong. So we are going to proceed." (J.A. at 324.)

The district court did not abuse its discretion by denying Hubbard's request to

substitute counsel. Mancino did not file his conditional entry of appearance until six days before Hubbard's trial was scheduled to begin. The district court inquired into the matter and determined Hubbard's complaints to be unfounded. Nothing in the record indicates that Hubbard suffered from any communication problems with his attorney, much less a total lack of communication. The court was even willing to allow Mancino to represent Hubbard and offered to move the suppression hearing, but only if Mancino was prepared to go to trial as scheduled. With all of these considerations, the district court appears to have weighed them properly and given due weight to the public's interest in the prompt and efficient administration of justice. Under these circumstances, the district court's denial of Hubbard's substitution of counsel does not constitute an abuse of discretion.

Hubbard next appeals denial of his motion to suppress statements made to police while in their custody. Hubbard alleges these statements are the result of an unreasonable delay in bringing him before a magistrate judge. Hubbard further alleges that the delay was a violation of Fed. R.Crim.P. 5(a), which states in relevant part:

> [A]n officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge or, if a federal magistrate judge is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041.

As in the motion to suppress above, the court reviews a district court's findings of fact for clear error and legal conclusions *de novo*. *United States v. Matthews*, 278 F.3d 560, 561 (6th Cir.2002). Failure to comply with the requirement of Federal Rule of Criminal Procedure 5(a) that an arrested person be brought before a magistrate judge without unnecessary delay "renders inadmissible statements obtained from an accused prior to his appearance before a magistrate." *United States v. Barlow*, 693 F.2d 954, 958 (6th Cir.1982) (citations omitted). Delay is measured from the time federal custody begins. *Id.* Further, "[f]or the purposes of Rule 5(a) the time which a defendant spends in state custody will not be attributable to federal detention in the absence of some working relationship between state and federal law enforcement personnel." 693 F.2d at 958. However, waiver of one's *Miranda* rights constitutes a waiver of one's rights under Rule 5(a). "A valid *Miranda* waiver also waives the prompt judicial warning of one's constitutional rights." 693 F.2d at 959.

■ Ross testified that he did not take Hubbard before a federal magistrate on the day of his arrest because Ross was not given permission to proceed federally until 3:30 p.m., at which time he was told by the federal prosecutor it was too late in the day to go before a magistrate. (J.A. at 332, 440P.) More importantly, Hubbard admitted that he was advised of his *Miranda* rights both at the time of his arrest and again at the police station. (J.A. at 336–37.) There is no indication in the record that Hubbard's statements to the police during a two-hour interview were anything less than voluntary. Hubbard's voluntary waiver of his *Miranda* rights equates to a waiver of his rights under Rule 5. The district court, therefore, is affirmed on this issue.

■ Hubbard further argues that the requirements of 18 U.S.C. § 3501(c) were violated. This argument is raised for the first time on appeal. "Ordinarily, the courts of appeals do not consider claims or

arguments that were not raised in the district court. But this is a prudential rule, not a jurisdictional one." *United States v. Hayes,* 218 F.3d 615, 619 (6th Cir.2000). Because the district court was never given an opportunity to rule on this issue, this court also declines to address it.

Hubbard next alleges multiple instances of prosecutorial misconduct that deprived him of his constitutional right to a fair trial. Claims of prosecutorial misconduct are generally mixed questions of fact and law subject to *de novo* review. *United States v. Jackson–Randolph,* 282 F.3d 369, 384 (6th Cir.2002). However, improper comments made by the prosecutor without objection are reviewed for plain error only. *United States v. Carroll,* 26 F.3d 1380, 1383 (6th Cir.1994).

Prosecutorial misconduct rises to the level of a constitutional violation only when the misconduct "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Hill v. Brigano,* 199 F.3d 833, 847 (6th Cir.1999). Although flagrant prosecutorial misconduct constitutes reversible error, "[w]here the error is not flagrant, reversal is inappropriate if *either* proof of defendant's guilt is overwhelming, *or* defense counsel failed to object to the error, *or* if the trial court cured the error with an admonishment to the jury." *Carroll* 26 F.3d at 1385, n. 6 (emphasis in original). Flagrancy is determined by examining "(1) the tendency of the comments to mislead the jury or prejudice the defendant, (2) whether the comments were isolated or extensive, and (3) whether the comments were made deliberately." *United States v. Brown,* 66 F.3d 124, 127 (6th Cir.1995).

Hubbard alleges that the prosecutor deprived him of a fair trial by attempting to impeach him and Garner as to inconsistencies between their trial and suppression hearing testimony without laying a proper foundation, by asking Hubbard extensively about whether he knew that Haqq, Garner, Sylvester Harris, Kent Harris, and Eddie were drug dealers, and by making improper comments during opening and closing arguments. Hubbard cites the prosecutor's statements that Hubbard was a drug dealer, that Garner lied, (J.A. at 427), and that it was a "coincidence" that Haqq, Eddie, and Kent Harris also were under investigation for drug trafficking, (J.A. at 431–32.) Finally, Hubbard points to several instances in the prosecutor's opening and closing arguments where he told the jury that they would find "the truth," i.e., that Hubbard was guilty. (J.A. at 342–43, 427.)

The majority of these statements came in without objection. Hubbard did object to the prosecutor's question, "Sylvester Harris is in jail, isn't he?" (J.A. at 410), asked during cross-examination of Hubbard. He also objected to the prosecutor's failure to refer to the transcript of the suppression hearing during cross-examination of Garner. (J.A. at 388, 395.) The district court sustained Hubbard's objections regarding improper impeachment and instructed the jury to disregard the question and answer regarding whether Sylvester Harris was in jail. At the close of the evidence, the district court instructed the jury to base its determinations solely on the evidence before them and not the court's evidentiary rulings or the statements of counsel. (J.A. at 421.)

▆ Turning to the standards enumerated above, the prosecutor's statements fail to constitute flagrant behavior. Nothing in the statements, on their face, would tend to mislead the jury or unduly prejudice the defendant, and Hubbard fails to indicate how, in fact, these statements would have any prejudicial effect. The statements appear to be isolated, and none of the statements appear to be deliberately

made to prejudice the defendant. That being said, it is most telling that defendant's trial counsel failed to object to the majority of the statements. Those statements that were objected to were addressed by the court with instructions to the jury. Further, Hubbard's confession, the physical evidence seized, and the lack of credibility of Hubbard's and Garner's testimonies amount to overwhelming evidence supporting Hubbard's conviction. Therefore, Hubbard's challenge on this issue is without merit.

■ Hubbard next argues that the district court erred in admitting testimony about other drug dealers allegedly associated with him. This court reviews admissions of evidence for an abuse of discretion. *Gibson v. United States*, 271 F.3d 247, 254 (6th Cir.2001). However, "an abuse of discretion that does not affect substantial rights is harmless error and is to be disregarded." *Id.* (citing Fed. R.Crim.P. 52(a)). Evidence admitted without objection is reviewed for plain error. *United States v. Fortson*, 194 F.3d 730, 736 (6th Cir.1999).

At Hubbard's trial, several law enforcement officers testified that Haqq and Kent Harris, individuals implicated in Hubbard's confession, were currently under investigation for drug trafficking, as was Sylvester Harris, the person to whom the car Hubbard was driving was registered. However, given Hubbard's testimony at trial that he was unaware that any of the individuals were involved in trafficking drugs, it was entirely proper impeachment testimony. It is likewise important to note that defense counsel failed to object to the vast majority of this testimony. Finally, with the abundance of evidence against Hubbard, there is no evidence that this testimony substantially prejudiced Hubbard. At worst, the admission of this testimony is harmless error. The district court's ad-

mission of this evidence was not an abuse of discretion and is, therefore, affirmed.

Hubbard also challenges a number of the jury instructions given by the court. Jury instructions to which the defendant objects, as a question of law, are reviewed *de novo. Fisher v. Ford Motor Co.*, 224 F.3d 570, 576 (6th Cir.2000). However, if the defendant fails to object to an instruction given at trial, it is reviewed for plain error only. *United States v. Thomas*, 11 F.3d 620, 629 (6th Cir.1993). In determining whether allegedly erroneous jury instructions violated the defendant's right to a fair trial, this court asks "whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *Fisher*, 224 F.3d at 575–76.

■ Hubbard first challenges the court's instruction regarding specific intent, which was as follows: "You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted." Hubbard contends that this instruction creates an unconstitutional mandatory presumption. However, this circuit has upheld this specific instruction as permissible in *United States v. Reeves*, so long as "the charge also contains language clearly placing upon the prosecution the burden of proof beyond reasonable doubt of all essential elements of the crime." 594 F.2d 536, 541 (6th Cir.1979). In this case, the jury also was instructed that the prosecution bore the burden of proof. (J.A. at 425.) Therefore, Hubbard's challenge on this issue is without merit.

Hubbard next argues that the instructions given concerning possession were inapplicable to the facts of this particular case. Those instructions were as follows:

Now, the law recognizes two types of—two kinds of possession: Actual possession and constructive possession.

A person who knowingly has direct physical control of a thing at any given time is then in actual possession of it. I've got, for instance, a pencil here. I'm in actual possession of this pencil.

A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

For example, I have pencils on my desk in my chambers. My law clerk will get them for me if I want them. And that's possession, also. That's constructive possession.

The law also recognizes that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

(J.A. at 423–24.) Hubbard claims that these instructions were misleading because "there is absolutely no evidence that he ever touched or possessed the item in question." Hubbard states that the example cited by the district judge implies that the judge at one time at least touched the pencils on his desk, which is not the case here. Hubbard further argues that the instructions constructively amended the indictment because there was no allegation that possession was constructive or that it was joint.

Hubbard's counsel, however, did not object to these instructions at the time they were given. Viewing the evidence given at trial, these instructions were not plainly erroneous. Furthermore, these instructions closely track the language found in the Sixth Circuit pattern instruction. Therefore, district court is affirmed on this issue.

Hubbard also argues that the district court's instruction on aiding and abetting was erroneous because the indictment did not allege aiding and abetting. However, the indictment charges Hubbard with violating 18 U.S.C. § 2, which provides in part, "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C.A. § 2(a) (West 2002).

Hubbard also argues that the district court erred in its rejection of his request for an instruction informing the jury that mere presence at the scene of a crime is not enough to convict for aiding and abetting. The record reflects, however, that Hubbard's counsel discussed and specifically agreed to the instruction given. That instruction contained language that, "[p]roof that the defendant may have known about the crime, even if he was there when it was committed, is not enough for you to find him guilty. Mere association with persons committing a crime is not enough for you to find him guilty." (J.A. at 426.) Because Hubbard's counsel was complicit in the instruction, this claim should be rejected.

█ Finally, Hubbard argues that the court erred in instructing the jury that in evaluating the credibility of the defendant's testimony, it should consider the same factors as it did in evaluating the credibility of other witnesses, including "evidence showing that the winess has been convicted of a felony."[1] (Hubbard Br. at 45.) Hubbard argues that this instruction misleadingly suggested that

1. This instruction is not included within the  Joint Appendix.

Hubbard had a prior felony conviction, which he did not. There was no evidence offered at trial suggesting that Hubbard had a felony conviction. Rather, as the government argues, this instruction was most likely given because of Garner's prior felony conviction. Moreover, there is no indication that the jury was confused by this instruction, and Hubbard provides no support on appeal for a conclusion that this instruction, if erroneous, constituted plain error. The district court, therefore, is affirmed on this issue.

Hubbard next argues that the government failed to prove an interstate commerce nexus to his drug trafficking offense, thus, depriving him of due process. This issue is brought up for the first time on appeal. Hubbard cites *U.S. v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in support. Normally, the court will not review challenges to constitutionality not raised before the district court. *United States v. Chesney*, 86 F.3d 564, 567 (6th Cir.1996.) However, the court "may exercise [its] discretion to review an issue not raised below in exceptional cases or particular circumstances, or when the rule would produce a plain miscarriage of justice." *Chesney*, 86 F.3d at 567–68 (internal quotations and citations omitted). As none of the foregoing conditions present themselves in this case, therefore, the court declines to address this issue.

Hubbard further argues that he was denied effective assistance of counsel because his trial attorney failed to object to the admission of certain evidence and to request particular jury instructions. "We generally will not review an ineffective assistance of counsel claim raised by a defendant for the first time on direct appeal." *United States v. Steverson*, 230 F.3d 221, 224 (6th Cir.2000). Further, "[s]uch claims are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 before the district court in which the parties 'can develop an adequate record on the issue.'" *United States v. Hill*, 142 F.3d 305, 308 (6th Cir.1998) (*quoting United States v. Daniel*, 956 F.2d 540, 543 (6th Cir.1992)). A limited exception applies when the record is sufficient to determine the merits of the defendant's allegations. *Id.* Such is not the case here. It is not readily apparent that Hubbard's trial counsel was constitutionally deficient. The court, therefore, declines to address this issue as well.

In his final issue on appeal, Hubbard challenges the three-level enhancement in his offense level under U.S.S.G. § 3B1.1(a) for his aggravating role in the offense and his two-level enhancement under U.S.S.G. § 3C1.1(a) for obstruction of justice. Hubbard first argues that these enhancements are in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Hubbard's second argument is that these enhancements are not supported by the evidence.

The district court's assessment of a defendant's role in criminal activity is a factual determination reviewed on appeal for clear error. *United States v. Caseslorente*, 220 F.3d 727, 734 (6th Cir.2000). In reviewing sentencing determinations, this court reviews the district court's findings of fact for clear error and the district court's application of the sentencing guidelines to the facts *de novo*. *United States v. Smith*, 39 F.3d 119, 122 (6th Cir.1994).

■ *Apprendi* is inapplicable in this case. The Supreme Court decided in *Apprendi* that the Constitution requires any fact that increases the penalty for a crime beyond the statutory maximum to be submitted to a jury and proven beyond a reasonable doubt. 530 U.S. at 490. Hubbard was found guilty of possession with intent to distribute more than five kilo-

grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2. The statutory maximum for this crime is life imprisonment. Yet, Hubbard was sentenced to 262 months. Clearly, this sentence is less than life imprisonment. A sentence increased pursuant to the sentencing guidelines based on a court's findings by a preponderance of the evidence is not improper when the defendant's sentence falls within the statutory maximum for the crime. *United States v. Schulte*, 264 F.3d 656, 660 (6th Cir.2001).

■ Hubbard's claim that the enhancements are unsupported by the evidence is likewise unavailing. The district court gave the two-level enhancement for obstruction of justice after determining that Hubbard perjured himself on the stand. The court further enhanced the offense level by three levels after determining that Hubbard was a manager or supervisor based on his supervisory control over Garner. A simple review of the record reveals that these findings are not in clear error. Therefore, the sentence imposed by the district court is affirmed.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's judgment as to all issues raised on appeal.