RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0046p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

BART STOVER (05-3562); TIMOTHY HINTON (05-3638),

*Defendants-Appellants.*

Nos. 05-3562/3638

>

Appeal from the United States District Court
for the Northern District of Ohio.
No. 04-00298—Dan A. Polster, District Judge.

Argued and Submitted: November 1, 2006

Decided and Filed: January 30, 2007

Before: CLAY and SUTTON, Circuit Judges; SHARP, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Matthew M. Robinson, ROBINSON & BRANDT, Cincinnati, Ohio, for Appellants. Blas E. Serrano, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Matthew M. Robinson, ROBINSON & BRANDT, Cincinnati, Ohio, David L. Doughten, DOUGHTEN & SMITH, Cleveland, Ohio, for Appellants. Blas E. Serrano, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

_____

**OPINION**

_____

CLAY, Circuit Judge. Defendants Bart Stover and Timothy Hinton appeal their criminal convictions. Defendant Stover was convicted of one count of conspiracy to possess with the intent to distribute cocaine and marijuana under 21 U.S.C. §§ 846 and 841(b)(1)(A), and one count of using a communication facility to facilitate the commission of a drug trafficking offense under 21 U.S.C. § 843(b) and 18 U.S.C. § 2. Defendant Hinton was convicted of one count of conspiracy to possess with the intent to distribute cocaine and marijuana under 21 U.S.C. §§ 846 and 841(b)(1)(B); two counts of possessing marijuana with the intent to distribute under 21 U.S.C. §§ 841(a)(1) and

---

[*]The Honorable Allen Sharp, United States District Judge for the Northern District of Indiana, sitting by designation.

841(b)(1)(D); and four counts of using a communication facility to facilitate the commission of a drug trafficking offense under 21 U.S.C. § 843(b) and 18 U.S.C. § 2. For the following reasons, we **AFFIRM** the judgment of the district court.

## BACKGROUND

The drug conspiracy that formed the basis of this case revolved around Manuel Garza, who, in the fall of 2001, moved from Texas to the area of Ashland and Mansfield, Ohio, and started selling cocaine and marijuana. Defendant Stover's primary involvement was in allowing drugs to be stored at a garage he leased in exchange for cash payments. Defendant Hinton was more actively engaged in the distribution of drugs. Garza supplied Defendant Hinton with marijuana and cocaine on a regular basis, and Defendant Hinton traveled with Garza to Texas to pick up shipments of marijuana on two occasions, where the shipments weighed forty and sixty pounds, respectively. On these trips, Defendant Hinton and Garza shared equally the cost of the drugs purchased.

On or about June 10, 2004, most of the participants in this conspiracy were arrested. On August 4, 2004, a federal grand jury returned a one hundred-count indictment that listed twenty-two defendants, including Defendants Hinton and Stover. Defendants Hinton and Stover were charged with conspiracy to possess with the intent to distribute marijuana and cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and with using a telephone to facilitate the commission of a drug trafficking offense in violation of 21 U.S.C. § 843(b). Defendant Hinton was additionally charged with possession of marijuana with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). Defendant Stover was additionally charged with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

Prior to trial, Defendant Hinton filed a motion to suppress evidence derived from a search of his house incident to his June 10, 2004 arrest, claiming that the search violated his Fourth Amendment rights. The district court held a hearing on the motion on December 17, 2004, and denied the motion on the same day.

A jury trial commenced on January 25, 2005. The prosecution elicited testimony from numerous co-conspirators and police officers, and entered into evidence multiple audio tapes that had been intercepted by the government, upon which Defendants Hinton and Stover were talking about drug deals. Defendant Hinton's defense at trial was that, although he was friends with Garza because their sons were friends, he was not involved with the conspiracy. According to Defendant Hinton, on one occasion Garza broke into his house and shot at him, because Garza believed that Defendant Hinton was selling drugs to Garza's customers. After this incident, Defendant Hinton allegedly feared for his life, and this fear caused him to agree to hold a quantity of drugs for Garza. Defendant Stover's defense at trial was also a denial of involvement in the conspiracy. The drugs that were stored in Defendant Stover's warehouse were hidden in pieces of furniture, and Defendant Stover claimed that though he allowed the furniture to be stored in his warehouse, he did not know that the furniture contained drugs. Defendant Stover presented three witnesses on his behalf, but did not testify himself.

The jury convicted Defendant Hinton of conspiracy to possess with the intent to distribute cocaine and marijuana, of possession of marijuana with the intent to distribute, and of using a telephone to facilitate the commission of a drug trafficking offense. Defendant Stover was convicted of conspiracy to possess with the intent to distribute cocaine and marijuana and of using a telephone to facilitate the commission of a drug trafficking offense, but was acquitted of the money laundering charges. On April 12, 2005, Defendant Stover was sentenced to a term of two hundred-forty months imprisonment. Defendant Hinton was sentenced on May 12, 2005, to a term of ninety-seven months imprisonment. Defendants Stover and Hinton filed timely notices of appeal on April 20, 2005 and May 16, 2005, respectively.

## DISCUSSION

**A.     WAIVER OF THE RIGHT TO TESTIFY**

The only issue Defendant Stover raises on appeal is whether his waiver of his right to testify on his own behalf was knowing and intelligent. We review the propriety of a defendant's waiver of his right to testify *de novo*. *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000).

A defendant's right to testify on his own behalf is a fundamental right. *See Rock v. Arkansas*, 483 U.S. 44, 52-53 & n.10 (1987). The right cannot be waived by a defendant's counsel on his behalf. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). In order for a defendant to waive a fundamental right, such waiver must be knowing and intelligent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973). However, not all fundamental rights must be waived by the defendant after an on-the-record colloquy with the court. *See United States v. Ortiz*, 82 F.3d 1066, 1071-72 (D.C. Cir. 1996). The waiver of certain fundamental rights can be presumed from a defendant's conduct alone, absent circumstances giving rise to a contrary inference. *See id.* at 1071 (citing cases that presume waiver of the right to represent oneself, the right to testify, and the right against self-incrimination in certain scenarios).

In *Webber*, we addressed the question now before us:

> Although the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed. [*United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)]. . . . Barring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record. *Joelson*, 7 F.3d at 177. *See also United States v. Ortiz*, 82 F.3d 1066, 1069 n.8 (D.C. Cir. 1996) (noting the agreement of the First, Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits that the trial court does not have a duty to sua sponte conduct an on-the-record colloquy regarding waiver) . . . .
> A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. *Joelson*, 7 F.3d at 177. At base, a defendant must "alert the trial court" that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. *Pelzer* [*v. United States*, 105 F.3d 659 (table), 1997 WL 12125, at *2 (6th Cir. Jan. 13, 1997) (unpublished)]. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so. *Joelson*, 7 F.3d at 177.

208 F.3d at 551. This case is controlled by *Webber*. Because Defendant Stover did nothing to alert the trial court of his desire to testify, the trial court correctly presumed that Defendant Stover waived that right. The trial court was therefore under no duty to inquire as to whether Defendant Stover's waiver was knowing and intelligent, and its failure to make such an inquiry was not erroneous.

The cases on which Defendant Stover relies are inapposite. In *Ward v. Sternes*, 334 F.3d 696, 705-08 (7th Cir. 2003), the court found the defendant's waiver involuntary. The court had questioned defendant Ward if he understood his right to testify and Ward responded, "I guess, I don't know." *Id.* The court also stressed that Ward's "brain injuries severely disrupted his ability to think, reason, take in verbal information, and understand and use language to express his understanding." *Id.* at 705-06. Ward's case was severe: He suffered from a brain condition known

as aphasia, which "manifests itself in . . . disconnect between questions asked of Ward and the answers he gives;" *id.* at 698, and although he had been found competent to stand trial, the fitness report stressed his cognitive disabilities. *Id.* at 706. *Ward* does not help Defendant Stover because nothing in the record suggests that Defendant Stover did not understand that he had the right to testify.

Defendant Stover also relies on *Ortega v. O'Leary*, 843 F.2d 258, 261 (7th Cir. 1988) and *United States v. Ortiz*, 82 F.3d at 1070, but neither of these cases undermine *Webber*'s holding.[1] In *Ortega*, the Seventh Circuit assumed for the sake of argument that the trial court erred when it failed to ensure that defendant Ortega had voluntarily waived his right to testify, and concluded that any error was harmless. *Ortega*, 843 F.2d at 262-63. Ortega had asked to take the stand, and implied that his attorney had told him he would be able to testify. *Id.* at 260. *Ortega* is thus consistent with, not in conflict with, the rule in *Webber* that a trial court has no duty to make an inquiry where the defendant does not "alert the trial court" of his desire to testify. *Webber*, 208 F.3d at 551. Nor can *Ortiz* carry the day for Defendant Stover. There, in dicta, the court stated that "it may behoove the district court to inquire directly of the defendant about the voluntariness of a decision to testify or not when the defendant has taken a position that threatens to jeopardize the defense case and there appears to be no rational explanation for the decision." *Ortiz*, 82 F.3d at 1071. But the court did not say that the contrary practice was reversible error. *Ortiz* is thus both not controlling and not in conflict with *Webber*. We conclude that the district court did not err in failing to *sua sponte* inquire as to whether Defendant Stover's waiver of his right to testify was knowing and intelligent.

## B.     MOTION TO SUPPRESS

Defendant Hinton first argues that the district court improperly denied his motion to suppress. "When reviewing the denial of a motion to suppress, we review the district court's legal conclusions de novo and the factual findings for clear error." *United States v. Taylor*, 248 F.3d 506, 511 (6th Cir. 2001).

The district court held a hearing on Defendant Hinton's motion to suppress on December 17, 2004, and denied the motion on the same day. At the hearing on the motion to suppress, the government presented the following facts: Seven federal agents, with an arrest warrant for Defendant Hinton, arrived at his house in Mansfield, Ohio. The arresting officers observed that there were two cars parked in Defendant Hinton's driveway, one registered to Defendant Hinton and the other to a man identified by local police to be "a local criminal, maybe like a burglar kind of guy." J.A. at 373. The latter individual's vehicle was registered to a different address than Defendant Hinton's address. Defendant Hinton lived in a duplex. His front door led into his living room. When the officers approached the house, they could see that there was a light on in the living room, and they could hear noise, which they later determined to be the television. The officers pounded on the door and announced themselves as police. The door was unlocked, and the officers pushed it open. The officers could hear movement inside the house. They entered the house, continuing to announce their presence. Shortly after they were inside, Defendant Hinton came down from the upstairs. While Defendant Hinton was being arrested, Defendant Hinton's son came down from the upstairs. At this point, officer Bellinger left to clear the rest of the house, leaving other officers to deal with the upstairs. He did this because of the vehicle parked outside, which caused the officers to be concerned that there was another adult in the house. Officer Bellinger went from the living room to the adjacent kitchen. Upon entering the kitchen, he opened a doorway that led

---

[1]Defendant also cites *United States v. Pennycooke*, 65 F.3d 9, 12-13 (6th Cir. 1995). This case provides no additional support, as it holds that defendant Pennycooke's right to testify was not violated, and merely mentions in dicta the exception found in *Ortega* to the general rule that a trial court need not inquire as to whether a defendant's waiver of his right to testify was knowing and intelligent.

into the attached garage.  When he looked into the attached garage, he could see that, towards the back of the garage, there was another room, with light coming out of it.  He cleared the garage area, and found that there was a laundry room in the back.  To the left of the entrance to the laundry room, there was a door to a crawl space, about three feet by three feet large, and light was emanating from the crawl space.[2]  Officer Bellinger cleared the room and found a marijuana growing operation inside the crawl space, which included multiple marijuana plants.  Another officer found a handgun in the upstairs that was in plain view.  Some officers stayed behind to secure the premises while Detective Brown obtained a search warrant based on the marijuana plants and the handgun.  A full search of Defendant Hinton's home revealed trash bags containing bricks and bags of marijuana, loose marijuana seeds, freezer bags that contained marijuana, over $5000.00 in currency from his dresser, wallet, and the living room, a .40 caliber Glock handgun, and seven other firearms.

Defendant Hinton contends that the district court improperly denied his motion to suppress this evidence.  Specifically, he argues that the original search exceeded the permissible scope of a protective sweep under *Maryland v. Buie*, 494 U.S. 325, 334 (1990), and therefore the items recovered under the authority of the search warrant should be excluded as fruit of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963).  The government does not argue that, were marijuana plants and the handgun excluded under *Buie*, the evidence obtained from the search warrant would nevertheless be admissible.  *See id.* (describing situations where evidence is admissible despite illegal police conduct).  Therefore, the only issue material to Defendant Hinton's motion to suppress is whether the original police search improperly exceeded the scope of a permissible search under *Buie* and thus violated the Fourth Amendment.

An arrest warrant founded on probable cause carries with it the limited authority to enter a suspect's home if there is reason to believe that he is there.  *Payton v. New York*, 445 U.S. 573, 603 (1980).  When officers have obtained an arrest warrant and they have reason to believe that the suspect is inside the house, they may search anywhere that the suspect might reasonably be found.  *See Buie*, 494 U.S. at 332-33.  Yet once a suspect is found, the arrest warrant does not justify a more intrusive search of the premises.  *Id.* at 333.

Generally, the government may not search an individual's home without the individual's consent or a search warrant supported by probable cause.  *See Payton*, 445 U.S. at 589-90.  In *Buie*, the Supreme Court articulated a limited exception to this general rule, authorizing officers making arrests in the home to conduct a "protective sweep"–a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers and others."  *Buie*, 494 U.S. at 327.  The *Buie* Court articulated two holdings:

> First, during a search incident to an arrest occurring inside a home, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  [*Buie*, 494 U.S. at] 334.  Second, officers may conduct a search more pervasive in scope when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Id.*

*United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996).

Turning to the instant case, it is clear that the marijuana plants cannot be construed as being in the "immediately adjoining" spaces or rooms.  The testimony of officer Bellinger reveals that, in

---

[2]Defendant Hinton alleges that the door was about two feet by two feet large.  Whether or not Defendant Hinton is correct, however, is immaterial to our analysis.

order to find the marijuana plants, he had to go through the kitchen, open the kitchen door, enter the attached garage, enter the laundry room, and then lean all the way into the crawl space. Nor was the gun, found upstairs, in the area immediately adjoining the downstairs living room where Defendant Hinton's arrest occurred.

The inquiry therefore becomes whether the officers had "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. We answer this question in the affirmative. The fact that police identified a car registered to a local criminal who did not live at Defendant Hinton's address is sufficient to justify a quick and limited protective sweep. That Defendant Hinton lived in a duplex is of no moment. The local criminal who owned the car in Defendant Hinton's driveway was as likely to be visiting Defendant Hinton as he was to be visiting Defendant Hinton's neighbor. This probability is sufficient to justify a protective sweep. *See United States v. Biggs*, 70 F.3d 913, 916 (6th Cir. 1995) (upholding a sweep of defendant Biggs' motel room where police had received information that Biggs was meeting someone at the motel, Biggs had left the motel door open so that anyone inside could see out, and, on two previous occasions, Biggs had been arrested in the presence of persons armed with firearms).

Defendant Hinton argues, however, that because of the remoteness of the crawl space and the size of the door, the officers nevertheless exceeded their authority to conduct a protective sweep. These arguments are without merit. Under the second prong of *Buie*, there is no requirement that the area searched be immediately adjacent to the area where the defendant was arrested. *See Buie*, 494 U.S. at 334. Although discovering the crawl space where the marijuana was found required officers to go through the kitchen, an attached garage, and the laundry room, it was nevertheless a part of the premises in which a potentially dangerous individual could be found. *See id.* at 335. Nor is the size of the opening of the door important. It is undisputed that the crawl space could hold a person. A small, out-of-the-way space makes a good hiding place for a dangerous individual; it is implausible to think that the persons who are the object of the protective sweep would limit themselves to large, open areas where they could be easily spotted. We therefore conclude that the district court properly denied Defendant Hinton's motion to suppress.

## C.     CONFRONTATION CLAUSE

Defendant Hinton next argues that the admission into evidence of tape recordings of him and a co-conspirator, Todd Allen, violated the Confrontation Clause, because Allen was not available to testify at trial. We review the question of whether the admission of evidence violates the confrontation clause *de novo*. *United States v. Stone*, 432 F.3d 651, 654 (6th Cir. 2005), *cert. denied*, 127 S. Ct. 129 (2006).

The Sixth Amendment states in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the Supreme Court "held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Davis v. Washington*, __ U.S. __, 126 S. Ct. 2266, 2273 (2006) (quoting *Crawford*, 541 U.S. at 53-54). The *Crawford* court, however, declined to give a precise definition of "testimonial." *See Crawford*, 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (footnote omitted)).

Subsequent cases have refined the definition of "testimonial" left open in *Crawford*. In *Davis*, the Supreme Court held that "statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." 126 S. Ct. at 2273.

*Davis* also held that testimonial statements marked "not merely [the Confrontation Clause's] 'core,' but its perimeter." *Id.* at 2274. In *Martinez*, this Court addressed the specific issue now before the court, and held that co-conspirators' statements made in pendency and furtherance of a conspiracy were not testimonial. 430 F.3d 317, 328-29 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1603 (2006).**[3]** The court in *Martinez* reasoned that *Crawford* had specifically stated, in dicta, that co-conspirators' statements were "by their nature not testimonial." *Id.* at 329 (citing *Crawford*, 541 U.S. at 56.) Furthermore, the *Martinez* court noted that *Crawford* cited *Bourjaily v. United States*, 483 U.S. 171, 182-84 (1987), which held that co-conspirators' statements are a firmly rooted hearsay exception for purposes of the Confrontation Clause, as a case that was consistent with the principles of *Crawford*. 430 F.3d at 329.

Because the evidence to which Defendant Hinton objects is co-conspirators' statements, Defendant Hinton's argument is squarely foreclosed by *Martinez*. We therefore conclude that the district court's admission of the tape recordings did not violate the Confrontation Clause.

**D.     JURY INSTRUCTIONS**

At trial, several audio tapes were played for the jury, one of which was in Spanish. The jury was provided transcripts of the audio tapes. The district court instructed the jurors that, if they noticed any differences between what they heard on the tapes and what they read in the transcripts, they had to rely on the tapes and not the transcripts. Furthermore, the district court told the jurors that if they could not understand part of the tapes they had to ignore the transcripts as far as that part was concerned. Defendant Hinton alleges that this instruction was erroneous. We review the district court's instructions to the jury for abuse of discretion. *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000). Here, it is undisputed that Defendant Hinton did not object to the jury instructions. Thus, this Court will reverse only for a plain error. *See United States v. Maliszewski*, 161 F.3d 992, 1003 (6th Cir. 1998). "Before this court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If those three factors are met, then this court may exercise its discretion to notice a forfeited error (4) if the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Dedhia*, 134 F.3d 802, 808 (6th Cir. 1998)).

Defendant Hinton cannot demonstrate error. Although it is proper in cases involving transcripts of Spanish language phone calls for those transcripts to be offered into evidence, Defendant Hinton never offered the transcripts as evidence in this case. *See United States v. Morales-Madera*, 352 F.3d 1, 9 (1st Cir. 2003) (discussing the admission of transcripts into evidence and citing cases affirming the practice). Because the transcripts in this case were not offered into evidence, instructing the jury that the transcripts should not be considered as evidence was proper. *See United States v. Wilkinson*, 53 F.3d 757, 762 (6th Cir. 1995); *United States v. Hughes*, 895 F.2d 1135, 1147 n.22 (6th Cir. 1990).

Moreover, even assuming that Defendant Hinton could show an error that was plain, he could not show that he was prejudiced, because the information on the Spanish-language tape was

---

**[3]***Martinez* interpreted *Crawford* only to abrogate prior Confrontation Clause jurisprudence with respect to testimonial statements, *Martinez*, 430 F.3d at 429 (citing *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)), while *Davis* made it clear that *Crawford* overruled that jurisprudence. *Davis*, 126 S. Ct. at 2275 n.4. Nevertheless, *Davis* did not affect the validity of *Martinez*'s holding that statements made in pendency and furtherance of a conspiracy are not testimonial.

also elicited through Defendant Hinton's cross-examination of Garza. Defendant Hinton's defense was that he only held drugs for Garza after Garza threatened him, and he therefore never joined the conspiracy. The Spanish-language tape contained a conversation between Garza and one of his drug-associates, Gilberto Ramirez. Garza was at Defendant Hinton's home when the conversation took place. In Spanish, Ramirez says to Garza, allegedly referring to Defendant Hinton, "Tell the Mfer to stop dicking around or I'll teach him a lesson." Def. Br. at 26. Garza allegedly relayed this to Defendant Hinton. Then, immediately after, on the tape, Garza says to Ramirez, in Spanish, "He is right here, scared shitless." Def. Br. at 27.

These facts were before the jury. Defendant Hinton's attorney brought out the following testimony from Garza on cross-examination:

Q.  In the conversation that was played on the tape in Spanish, that was Mr. Ramirez talking to you in Spanish, correct?
A.  Yes.
Q.  And at one point in that conversation, the statement is made, "Tell that mother fucker to stop dicking around or I'll teach him a lesson," correct?
A.  Yes.
Q.  And that's what Mr. Ramirez says to you, correct?
A.  Yes.
Q.  And you tell [Defendant Hinton] that, don't you?
A.  Hmm? Yes. [Ramirez] is a comedy guy.
Q.  And then right after that, you talk back to Mr. Ramirez and you say "He is right here, scared shitless." That's the context, isn't it?
A.  I said it in Spanish. Something like that.
Q.  You had a further discussion with [Defendant Hinton] after this conversation that took place on the telephone, didn't you?
A.  What was that?
Q.  You explained what you had talked about in Spanish to Ramirez with [Defendant Hinton]?
A.  Yes.

J.A. at 768-69.

Because the information that Defendant Hinton complains was excluded from the jury was before them in this admissible form, he cannot demonstrate prejudice. We therefore conclude that the district court's instructions to the jury do not require reversal.

## E.   PROSECUTORIAL MISCONDUCT

Defendant Hinton argues that five statements made during the prosecutor's closing argument constituted misconduct that warrants reversal. We review the question of whether prosecutorial misconduct requires reversal *de novo*. *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002). Since Defendant Hinton did not object to the prosecutor's statements at trial, we will only reverse for plain error. *United States v. Young*, 470 U.S. 1, 6 (1985); *United States v. Cummins*, 969 F.2d 223, 227 (6th Cir. 1992).[4]

---

[4]Defendant Hinton argues that review should be conducted for harmless error. However, in making this argument, he attempts to borrow our standards for habeas review and apply them to the context of a direct appeal. *See Pritchett v. Picher*, 117 F.3d 959, 964 (6th Cir. 1997). The inquiry when a federal court sitting in habeas evaluates prosecutorial misconduct by state prosecutors and the inquiry when a federal court evaluates prosecutorial misconduct on direct appeal are not analogous. *See Byrd v. Collins*, 209 F.3d 486, 529 n.37 (6th Cir. 2000). *Young* and *Cummins* confirm that plain error is the appropriate standard to use in evaluating Defendant Hinton's claims.

"When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper. If they appear improper, we then look to see if they were flagrant and warrant reversal." *United States v. Tocco*, 200 F.3d 401, 420 (6th Cir. 2000) (citations omitted). "To determine flagrancy, the standard set by this Court is: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Id.* Flagrantly improper remarks by the prosecutor require reversal. However, if the prosecutor's remarks are not flagrant, then this Court will only reverse "if proof of [the defendant's] guilt was not overwhelming, [the defendant] objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury." *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir. 1994) (citing *United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979)). In this case, the evidence against Defendant Hinton was strong, and he failed to object to the remarks at trial. We will therefore only reverse if the prosecutor's remarks were flagrant. *See id.*

Defendant Hinton first points to a remark that the prosecutor made in the context of reviewing a conversation that took place between Ramirez and Defendant Hinton. The prosecutor stated:

> And then Gilberto tells Hinton, "whatever he tells you, that's the fact, bro. You want to work?"
> "Oh yeah"
> "Trust him [meaning Garza]. You want to go big? Trust in him or you're out of the game. Hey man, hey, it's all okay. *If you want to deal with us, that is what you have to do.*"

J.A. at 1016-17 (emphasis added).

The transcribed portion of the telephone call actually reads as follows:

> "You want to go big? Trust in him, or you're out of the game. Hey . . . Hey . . . Hey . . . it's all O.K."

Gov't Br. at 39; Def. Br. at 34.

Defendant Hinton asserts that the last part of the statement–"If you want to deal with us, that is what you have to do"–was improperly presented as a quotation, and that it impermissibly suggested an agreement between Defendant Hinton and Garza. This contention lacks merit. As the government argues, the prosecutor was merely paraphrasing the meaning of the conversation. Although this is not the only conceivable meaning, it is a meaning that is supported by the evidence. It was therefore not an improper statement. And in any event, this statement could not rise to the level of flagrancy because there is no appreciable chance that it prejudiced Defendant Hinton. The actual tape was played for the jurors both during trial and during their deliberations, at their request. This refutes any claim that the statement misled the jury or prejudiced Defendant Hinton. *Tocco*, 200 F.3d at 420.

Next, Defendant Hinton argues that the prosecutor improperly characterized the testimony of Adam Pagani, a co-conspirator. The prosecutor stated:

> Later on, I believe [Pagani] said the next day, [a third person] came with another duffel bag, and he saw Mr. Hinton paying him with a shoebox that was full of money, . . . and then later on the truck driver who had delivered the duffel bag came back a couple days later, brought another duffel bag, and Mr. Hinton had put that marijuana, he believed, in the safe.

J.A. at 974.

The transcript of Pagani's direct examination reads:

Q. What was done with the marijuana that was brought?
A. It was placed – it was weighed and placed in the safe, as far as I know.
Q. Did you actually see it being placed in the safe?
A. No.

J.A. at 505.

Defendant Hinton contends that the prosecutor improperly stated that Pagani testified that Defendant Hinton put marijuana in the safe. This argument fails. The prosecutor said Pagani *believed* that Defendant Hinton put the marijuana in the safe. This was supported by Pagani's testimony that, as far as he knew, the marijuana was placed in the safe. Defendant Hinton did not object to that testimony at trial. The evidence was therefore properly part of the record, and the prosecutor committed no error by referring to it.

Defendant Hinton next takes issue with the following statement made by the prosecutor during his closing argument, referring to things that Ramirez said in Spanish:

"I just want to tell you that – who was it was asking me all that?"
"It was that white dude who was out there with me." Out there? Where is Ramirez?
He's is in Texas. What did [Defendant Hinton] say? He was never in Texas. *He is a liar because he was in Texas.*

J.A. at 1015-16 (emphasis added).

Defendant Hinton contends that the prosecutor improperly interjected his opinion on the evidence–that is, the prosecutor gave his personal opinion that Defendant Hinton's testimony that he was not in Texas was false. Furthermore, Defendant Hinton contends that it was improper and prejudicial for the prosecutor to call him a liar. The prosecution may imply that a defendant is lying during its closing argument so long as the prosecutor emphasizes discrepancies between the defendant's testimony and the record. *United States v. Owens*, 426 F.3d 800, 806 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1089 (2006). Defendant Hinton had testified that he had never been to Texas. Contradictory evidence suggested that, in fact, Defendant Hinton had been to Texas. The prosecutor's statements were in direct reference to this contradiction. It would therefore have been proper for the prosecutor to argue that the jury should infer that Defendant Hinton was not credible, and should not be believed. *See id.* Although the prosecutor's remarks did more than this, it does not rise to the level of flagrancy. The difference between what the prosecutor actually said–"he is a liar"–and what the prosecutor could have permissibly said, that the evidence suggested that Defendant Hinton's testimony is not credible, is minimal. This statement does not require reversal under *Tocco*.

Defendant Hinton also alleges that the prosecutor improperly stated that Defendant Hinton testified to receiving marijuana from Defendant Stover. The prosecutor's closing argument reads:

We're not saying that Stover is a big distributor. He did dabble here and there, *like you heard Hinton*, that he received some marijuana from him.

J.A. at 1024 (emphasis added).

Defendant Hinton claims that this improperly suggested that he had testified to facts to which he did not testify. This argument is without merit. The government notes that its reference was to

an intercepted conversation where Defendant Hinton asked Garza if "that Bart guy" had any "little ones," which Garza testified referred to ounces of marijuana. J.A. at 708. Although Defendant Hinton did not directly assert that Defendant Stover dealt drugs, (instead he merely asks whether Defendant Stover had any drugs), any error in this characterization of the testimony would not be flagrant because it was likely accidental and was of minimal prejudice. *See Tocco*, 200 F.3d at 420.

Defendant Hinton's last objection is to a statement that the prosecutor made while referring to a conversation between Defendant Hinton and Allen:

"I [Defendant Hinton] was wanting to know, man, if I get rid of this last bit of work, you [Allen] got any more work for me?" Well, are we talking about transmissions here with Allen?
Getting rid of work? He wants more work? *These are people who never worked in their lives. They are just selling drugs.*

J.A. at 1023 (emphasis added).

Although this statement is not model prosecutorial conduct, it is not flagrant under *Tocco*. *See United States v. Garner*, Nos. 00-4395, 00-4409, 46 F. App'x 278, 289-90, 2002 WL 31007867, at *10-*11 (6th Cir. Sept. 5, 2002) (unpublished) (upholding conviction where the prosecutor called the defendant a "drug dealer"). Here, as in *Garner*, there is no strong showing of prejudice, nor does the remark appear from the record to be intended to prejudice the defendant.

Of course, a pattern of improper statements may require reversal where no individual statement by itself is sufficiently prejudicial. *See Tocco*, 200 F.3d at 420. That is not the case here. Two of the statements to which Defendant Hinton objects–the prosecutor's characterization of Pagani's and Ramirez's testimony–are not improper. Of the remaining three statements, two more–calling Defendant Hinton a liar and mischaracterizing Defendant Hinton's statement on the tape recording–are of minimal prejudice, if any. Taking all five together, the remarks were not likely to mislead the jury or prejudice the defendant, and the record does not show a series of improper remarks deliberately placed before the jury. Furthermore, the evidence against Defendant Hinton at trial was strong. In sum, the combined weight of the statements does not rise to the level of plain error. *Id.*

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the convictions of Defendants Stover and Hinton.