NOT RECOMMENDED FOR PUBLICATION
File Name: 08a0106n.06
Filed: February 20, 2008

No. 07-5330

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| DONALD E. WATTS, | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: MERRITT, GILMAN, and COOK, Circuit Judges.

RONALD LEE GILMAN, Circuit Judge. In November of 2006, Donald E. Watts was convicted on one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). He was sentenced to 102 months of imprisonment. Watts's sole issue raised on appeal is the prosecutor's alleged misconduct during her closing and rebuttal arguments. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

**A.    Factual background**

In March of 2006, the eMachine-brand computer used by the Somerset Elite Training Center gymnasium (Somerset Elite) began to experience technical problems. At the time, Watts was a co-

owner of Somerset Elite. The computer was taken by Barbara Lawson, an employee of Somerset Elite, to Mike Velez, a computer repairman. During his repair work, the title of a file caught Velez's eye. He said that the title contained references to a "[s]even-year-old girl being raped, something of that sort."

After discovering that initial file, Velez "looked deeper" into the computer and "started to pull up some of the video files." He watched part of a video involving child pornography, and then called Lawson. The two of them began to search the computer more thoroughly. A further investigation of the computer by Velez revealed a number of online chatroom conversations with various young girls.

The next day, Velez showed Aislynn Frei, the other co-owner of Somerset Elite, and Randy Goff, a local police officer, a short segment of the video file that he had initially discovered. Velez also told Officer Goff about the chatroom transcripts he found under Watts's user name. With Frei's consent, Goff took the computer with him after viewing the video. Frei also consented to Goff's request to examine a home-built computer that had previously been used by Somerset Elite. Goff then contacted Special Agent Donnie Kidd of the FBI for further assistance.

Agent Kidd prepared a search warrant for the two computers. Based on the information from Officer Goff regarding the chatroom transcripts, Kidd went to Somerset Elite in order to speak with Watts. Kidd did not have an arrest warrant and made no attempt to take Watts into custody. He referred to the interaction with Watts as an "interview" rather than an interrogation. Watts cooperated with Kidd and answered his questions without any legal compulsion to do so.

According to Kidd's testimony at trial, Watts confessed during the interview to using both of the seized computers to search for and download child pornography. During the conversation, Watts told Kidd that he would "come in late at night, sometimes after midnight, would be drinking, would get on the computer and would surf the Internet, again looking for porn to include adult and child pornography." He used a file-sharing program called LimeWire to locate pornography by typing in words such as "young" and "video."

Watts told Kidd that he thought he had deleted all of the pornographic files from the home-built computer, but said there were probably 12 or 13 pornographic video files remaining on the eMachine computer that he did not have time to erase. He further explained that "there should be one, if not two, short video clips containing child pornography." Watts provided Kidd with the file path that could be used to locate the saved files on the hard drive. According to Kidd's testimony, Watts also provided Kidd with the username and password that Watts had used to access the computer. Watts told Kidd that this so-called "owner" account was his own personal account that was not used by the other Somerset Elite employees.

Kidd also asked Watts about the online chatroom files that Velez had discovered. Watts admitted that he used the computer to chat with students at Somerset Elite. He provided Kidd with two specific screen names that Watts had used—"Donflipflop" and "Success is trying one more time and you fall"—and told Kidd of a third screen name that he could not remember exactly but referred to his dog dying.

Both of the computers were sent to the Electronic Crimes Section of the Kentucky State Police, where they were forensically examined by Detective Christopher Frazier. According to his

trial testimony, Frazier's forensic examination confirmed much of the information that Watts had reportedly told Kidd. The home-built computer contained over 100 images of child pornography. These files were found in the "unallocated space" of the computer, meaning space that was not otherwise being used.

Frazier found one video file containing child pornography on the eMachine computer. He also found 11 other pornographic videos that contained words in their titles that might have suggested that they contained child pornography, but that in fact featured adult pornography. Frazier further testified that (1) the files were found in the exact folder that Watts had specified to Kidd, (2) the files could be accessed only through the owner account with the user name and password that Watts had provided, and (3) the files had been downloaded using LimeWire.

With respect to the online chats that Velez initially discovered, Frazier's examination of the eMachine computer revealed over 5,100 pages of chatroom transcripts. The chatroom logs were filed under the user name "Donflipflop" and also featured the screen name (the name seen by people who are chatting with the user) of "Success is trying one more time and you fall." According to Frazier, the people chatting with "Success is trying one more time and you fall" frequently addressed the screen name as "Donnie."

The content of the chatroom transcripts was not at issue during the trial, but the connection between the chatroom conversations and the downloading of the pornographic files was disputed. Specifically, at approximately 12:04 a.m. on February 16, 2006, someone using the screen name "Success is trying one more time and you fall" was engaged in a chat. Not long thereafter, someone was accessing pornographic video files in the LimeWire folder that was identified by Watts and

confirmed by Frazier's investigation. The videos were opened at 12:48 a.m., 1:09 a.m., and 2:40 a.m. Watts's own computer expert testified that a number of the pornographic files that were found on the eMachine computer were downloaded in the same general period of time when someone was engaged in online chats using the screen names "Success is trying one more time and you fall" and "Four legs got run over sniff sniff."

During her closing argument, the prosecutor made repeated references to the conversation between Watts and Agent Kidd, which she described as a confession. She paraphrased what Watts allegedly said to Kidd and presented those statements as direct quotes. Watts now appeals on the basis of those statements, which he alleges are misrepresentations of the evidence that confused the jury and prejudiced him. He also asserts that the prosecutor made improper statements infringing upon his right not to testify and commenting on his honesty. The specific objected-to statements will be addressed in detail in the analysis below.

## B. Procedural background

Watts was indicted in June of 2006 and tried five months later. The trial lasted one and a half days, resulting in a jury verdict of guilty. During the trial, Agent Kidd testified regarding Watts's statements to him. Defense counsel made no objections to the testimony, and Watts did not take the stand on his own behalf. Judgment against Watts was entered in March of 2007. This timely appeal followed.

## II. ANALYSIS

## A. Prosecutorial misconduct

We evaluate claims of prosecutorial misconduct using a two-step inquiry. "First, the [c]ourt must determine if the government's statements were improper." *United States v. Abboud*, 438 F.3d 554, 584 (6th Cir. 2006). If we determine that the statements were in fact improper, then we "must decide whether the statements were flagrant." *Id*. The "flagrancy inquiry" involves four factors:

(1)     whether the remarks tended to mislead the jury or to prejudice the accused[,] including whether the trial judge gave an appropriate cautionary instruction to the jury;

(2)     whether they were isolated or extensive;

(3)     whether they were deliberately or accidentally placed before the jury; and

(4)     the strength of the evidence against the accused.

*Id*. (citation and original brackets omitted).

If we determine that the statements were not flagrant, then "the [c]ourt will reverse only if (1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the court failed to give a curative instruction." *Id*. (citation and internal quotation marks omitted). We review such claims de novo where the defendant makes a timely objection. *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004). Otherwise, we examine the defendant's claims under the plain-error standard of review. *Id*.

"[P]rosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even if the defendant did not object to it." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (internal quotation marks omitted). Plain-error review requires the court to determine whether (1) there was an error, (2) the error was "obvious or clear," (3) the error affected the defendant's substantial rights, and (4) the error "seriously affected the fairness, integrity,

or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (internal quotation marks omitted).

Watts asserts that he objected to a statement made by the prosecutor during her rebuttal closing argument and that he is therefore entitled to a de novo review of his prosecutorial-misconduct claims. In response, the government contends that the objection made by Watts during the trial was not to any of the statements that are now alleged to be improper. Moreover, Watts did not seek a curative instruction at the close of the argument. We find that the government's analysis of the record is correct. Watts's sole objection during the prosecutor's rebuttal argument was in reference to a statement that is not before us on appeal. We will therefore review Watts's claims of prosecutorial misconduct under the plain-error standard.

## B.     The propriety of the prosecutor's comments

Watts argues that the prosecutor made three different types of improper comments: (1) during her closing and rebuttal closing arguments, she "misstated evidence and attributed additional statements and confessions to the defendant that were not in evidence," (2) during her closing and rebuttal closing arguments, she "made comments infringing on the defendant's right not [to] testify," and (3) during her rebuttal closing argument, she "commented on the honesty of the defendant throwing the weight of the office of the prosecutor behind the honesty of the defendant by commending him for his honest confession." In response, the government asserts that none of the prosecutor's statements were improper and that Watts is accordingly not entitled to a new trial.

### 1.     *Misstatements of the evidence*

The alleged misstatements that Watts points to all arise out of attempts by the prosecutor to convey the information that Watts purportedly provided to Agent Kidd during their unrecorded conversation. Watts claims that these statements by the prosecutor represent either inaccurate or completely fabricated accounts of Kidd's testimony. Specifically, Watts objected to the following statement by the prosecutor of what Watts purportedly told Agent Kidd:

> Yeah, I downloaded child pornography. In fact, I downloaded child pornography on both computers. I looked at normal pornography, I looked at child pornography. I searched for child pornography. In fact, I knew it was on there. In fact, I knew there were several videos on there, at least a couple of which I knew contained child pornography.

What Watts takes issue with are the prosecutor's contentions that Watts actively "searched" for child pornography and that there were "at least a couple" of videos containing child pornography stored on the computer. A review of Kidd's testimony, however, supports the propriety of the prosecutor's statement. Kidd testified about the two different computers used by Watts in chronological order. With respect to the first—the home-built computer—Kidd testified that Watts

> acknowledged to me that he did in fact use that computer to surf the Internet and to access pornographic Websites and to download both adult and child pornography. He told me he would delete these images, he would look at them a couple times and then delete them.

Watts allegedly told Kidd that he "thought he had erased all of the pornographic images from the specific computer."

According to Kidd, Watts then told him that with the second, eMachine computer

> he would actually come in late at night, sometimes after midnight, would be drinking, would get on the computer and would surf the

> Internet, again looking for porn to include adult and child pornography.
>
> He would go to the LimeWire program and type in words such as "young" and "video," just to see what was out there and what would pop up.
>
> And images of child pornography would come up. He would download those, along with the adult pornography. Again, he would look at those a couple of times, and then he would delete those off the computer.
>
> In this instance, with the eMachine, however, he told me there would be in fact probably be 12 to 13 short video clips that he did not have time to erase. And there should be one, if not two short video clips containing child pornography, and that would be saved under—I think the path he gave me was computer, programs, LimeWire, and then was saved under magnet and root in the subfiles.

The prosecutor asked whether this meant that Watts actually told Kidd "how you would get to the images on the computer?" Kidd responded: "Correct, he told me what was on there and where it would be found."

Although Watts correctly points out that Kidd never explicitly said that Watts "searched" for child pornography and that Kidd actually said that there would be "one, if not two" videos, rather than "at least a couple," we conclude that the prosecutor's statements were not improper. When she used the word "searched" and stated that there were "at least a couple" of videos, the prosecutor was "merely paraphrasing the meaning of the conversation" between Kidd and Watts. *See United States v. Stover*, 474 F.3d 904, 915 (6th Cir. 2007) (concluding that the prosecutor's statement was not improper where it was presented as a quotation, even though it was not actually said during the conversation at issue).

In *Stover*, this court held that the prosecutor's paraphrasing was not improper because, "[a]lthough it is not the only conceivable meaning [of the conversation], it is a meaning that is supported by the evidence." *Id.* Both of the statements objected to by Watts in the instant case represent meanings that are strongly supported by Kidd's testimony. Kidd did not use the word "searched," but he did say that Watts confessed to using the home-built computer to "surf the Internet and to access pornographic Websites and to download both adult and child pornography," and on the eMachine computer Watts would "get on the computer and would surf the Internet, again looking for porn to include adult and child pornography. He would go to the LimeWire program and type in words such as 'young' and 'video,' just to see what was out there and what would pop up." A highly supportable meaning of these statements is that Watts was *searching* for child pornography.

Moreover, the difference between "at least a couple" of videos (what the prosecutor said) and "one, if not two" videos (Kidd's testimony) is negligible in the overall context of the trial. Although "at least a couple" could lead one to believe that there were more than two videos to be found on Watts's computer, it does not so overstate Kidd's testimony (that Watt's told him there would be "one, if not two" videos) as to be unsupported by the evidence. *See Stover*, 474 F.3d at 915 . We thus conclude that neither of these statements was improper.

Watts also takes issue with the following six statements made by the prosecutor during closing argument: (1) "Yeah, I downloaded child pornography. In fact, I downloaded child pornography on both computers," (2) "Yeah, when I looked at pornography, including child pornography, I used LimeWire," (3) "When I downloaded child pornography or any pornography, I would save it using the file path," (4) "I searched for child pornography. I was just curious. I

- 10 -

wanted to know what was out there. I typed words such as 'young,' such as 'video,'" (5) "I didn't just look at child pornography using the eMachine computer . . . . I looked at it on the previous one, too," and (6) "Yeah, I used it to look at child pornography. I think I deleted it, but I'm not sure. You may still find it on there, but I believe I deleted it." According to Watts, "[i]f one were to listen to the prosecutor's version of what the defendant said, every phrase the defendant stated would begin with 'Yeah, when I look at child pornography.'"

As with the "searched" and the "at least a couple" statements addressed earlier, the prosecutor in each of these six objected-to statements was paraphrasing the testimony of Agent Kidd. Each of the six statements, moreover, is supported by the evidence presented in Kidd's testimony. According to that testimony, Watts told Kidd that (1) he downloaded child pornography on both computers, (2) he used LimeWire to find the pornography, (3) he used a specific file path to save the pornographic files he found, (4) he would type in the words "young" and "video" in order to "see what was out there," (5) he used both of the computers to look at pornography, and (6) he deleted some of the files, but thought there might still be some on the eMachine computer. Although she occasionally prefaced her statements with an introductory comment similar to "when I looked at child pornography," all of the prosecutor's statements presented "meaning[s] that [are] supported by the evidence." *See Stover*, 474 F.3d at 915. We therefore conclude that none of the prosecutor's alleged misstatements regarding Watts's confession to Kidd were improper.

### 2. *Statements regarding Watts's right not to testify*

Watts also asserts that the prosecutor engaged in misconduct when she allegedly made two statements regarding his right not to testify. Specifically, during her initial closing argument, the

prosecutor said: "Ladies and gentlemen, every other witness that came up here says they absolutely didn't download child pornography. You know what the defendant said? Yeah, I downloaded child pornography." Then, during her rebuttal argument, the prosecutor said:

> Ladies and gentlemen, you heard me ask every single one of those other people who came up there whether they were the ones that were downloading child pornography on the computer. And you heard their responses: "Absolutely not. Absolutely not." That is not what the defendant said. He said "Absolutely, yes, I did."

Watts now argues that these two statements, which compared the content of his conversation with Agent Kidd to the trial testimony of the witnesses, "could mislead a jury . . . as to when and if [the] defendant testified, or if they, the jury, were not privy to some testimony."

Viewing these two comments "within the context of the trial as a whole," Watts's argument is meritless. *See United States v. Beverly*, 369 F.3d 516, 543-44 (6th Cir. 2004) (examining the context surrounding allegations of prosecutorial misconduct in rejecting the defendant's claims). Throughout her closing and rebuttal arguments, the prosecutor made repeated reference to what Watts told Agent Kidd. The closing argument as a whole makes clear that the statements that Watts now objects to were the prosecutor's attempt to paraphrase Kidd's testimony, which in turn represented the only evidence of what Watts had said regarding the crime in question. Moreover, in light of the fact that the trial lasted only one and a half days, it is implausible that the jury was somehow misled about whether there was some other testimony that the jury did not get to hear.

The Fifth Amendment provides in relevant part that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The typical claim of prosecutorial misconduct with respect to a defendant's right not to testify arises when the prosecutor

uses that silence as substantive evidence against the defendant. *See Girts v. Yanai*, 501 F.3d 743, 756, 758 (6th Cir. 2007) (finding misconduct sufficient for reversal where the prosecutor made three statements that "attached a negative connotation to the exercise of the Fifth Amendment right to remain silent"). In *Girts*, this court concluded that the prosecutor's statements "were improper, misleading and highly prejudicial because they implied that [the defendant] was obligated to testify and to speak to the police." *Id.* at 756. No such implication arises from the prosecutor's statements in the instant case.

In paraphrasing what Watts actually told Agent Kidd, the prosecutor did not "attach[] a negative connotation to" Watts's Fifth Amendment right. *See id.* Instead, the statements made by the prosecutor were supported by the evidence of Kidd's testimony and represent not silence, but rather admissions on the part of Watts. We conclude that Watts's challenge to the statements that allegedly implicate his right not to testify is without merit.

### 3.      *Statements regarding Watts's honesty*

Watts further alleges that the prosecutor improperly vouched for his honesty during her rebuttal closing argument. Specifically, he objects to the prosecutor's statement that when Watts spoke with Agent Kidd, "[h]e was being very cooperative, and he was telling the truth. I have to commend him for at least telling the truth to Special Agent Kidd when he came to ask the questions." The government replies by pointing out that the prosecutor's statement was in direct response to Watts's closing argument, wherein his trial counsel said:

> People, why would anybody confess to a federal felony to a cop when
> they walked in. "Hey FBI. I'm going to ask you some questions."
> "Oh, yeah, I did it."

> It's ludicrous to believe that the gentleman confessed to anything. I told you in [my] opening statement that I believe the government, specifically Special Agent Kidd, he drew some conclusions early on to some very specific questions.

According to the government, the prosecutor's statement was not improper vouching, but was a permissible response to the attempt to attack Agent Kidd's credibility.

"Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility[,] thereby placing the prestige of the office of the United State Attorney behind that witness." *United States v. Jackson*, 473 F.3d 660, 670 (6th Cir. 2007) (alteration in original) (citation omitted). The full context of the prosecutor's statement is as follows:

> Why would someone confess to a federal crime? It makes no sense, says Mr. Benge. Why in the world would anybody say, "Yeah I was looking at child pornography on the computer" when the FBI comes and asks if you know anything about anything improper that might be on the computer?
>
> Why in the world would you do that, he says? The reason that you do that is because you're guilty of doing that.
>
> Now, you or I can't sit there and say what was going through his head. He was being cooperative, and he was telling the truth. I have to commend him for at least telling the truth to Special Agent Kidd when he came to ask the questions.
>
> Why would you confess? You would confess because that's what you did.

A review of the prosecutor's statement indicates that she was responding to Watts's direct attack on the credibility of Kidd's testimony and the sufficiency of Kidd's investigation. The statement was not "founded upon an implication that the prosecutor personally believed [Watts] or

knew of evidence not before the jury that demonstrated [his] truthfulness." *See Jackson*, 473 F.3d at 672. Rather, the statement was founded on the fact that Watts, through his closing argument, had placed Agent Kidd's testimony and the accompanying veracity of Watts's confession at issue. Moreover, we are not aware of any authority prohibiting the prosecutor from vouching for the credibility of what is purportedly the *defendant's own testimony*, as opposed to that of a witness for the prosecution. We conclude that the prosecutor's statement regarding the truthfulness of Watts's confession to Kidd was not improper vouching.

**C.      Flagrancy of the prosecutor's statements**

Even if we were inclined to find one or more of the preceding statements by the prosecutor improper, none were so flagrant as to warrant a new trial. Although "a pattern of improper statements may require reversal where no individual statement by itself is sufficiently prejudicial," such is not the case here. *See United States v. Stover*, 474 F.3d 904, 917 (6th Cir. 2007). Watts argues that the prosecutor's statements misled the jury and prejudiced him—the first flagrancy factor—because the jury twice asked for a copy of what Watts said (i.e., a transcript of Kidd's testimony) during its deliberations. These requests were denied, in part because Watts's attorney objected to creating a transcript of Kidd's testimony for review by the jury. Moreover, as the district court noted, "this jury has not hesitated to ask me questions, that they might ask me again if they are really stuck and can't get past whatever seems to be bothering them."

The district court then instructed the jury that "[a] transcript of Agent Kidd's testimony is not readily available. You should rely on your memory of the evidence presented in the court." No further questions from the jury were presented to the court, indicating that "whatever seem[ed] to

be bothering them" did not stand in the way of reaching a unanimous guilty verdict. The jury's requests also indicate that it was not misled into believing that Watts had testified, the argument that Watts now raises in objecting to the comments he claims infringed upon his Fifth Amendment rights.

With respect to the second and third flagrancy factors—the extensiveness of the statements and whether they were deliberately placed in front of the jury—the government concedes that the prosecutor's alleged misrepresentations of Watts's confession constituted "several deliberate statements." The government asserts, however, that the comments allegedly infringing on Watts's refusal to testify and expressing an opinion as to his truthfulness were brief and isolated, and that the prosecutor's statement that "every other witness that came up here says they absolutely didn't download child pornography" was accidental in nature. Contrary to the government's contentions, we believe that the prosecutor's statements were more than brief and isolated and that they were deliberately put in front of the jury. But this conclusion alone is insufficient to support a finding of flagrancy that would warrant reversal.

Watts's only argument challenging the strength of the evidence against him—the fourth flagrancy factor—is based on the prosecutor's statement during her rebuttal argument that "[b]y all accounts, there were a lot of people who had access to that computer. And we might not be here today if the defendant himself hadn't told us who the person was that was responsible." This statement was made in response to Watts's theory of the case and closing argument to the effect that someone else with access to the computer downloaded the child pornography, and that Agent Kidd lied about Watts's confession.

According to Watts, "[w]ithout a confession from the defendant, there was only circumstantial evidence of who committed this crime." The flaw in Watts's argument is that even if the prosecutor's statements about the alleged confession were excluded, the confession itself had already been admitted into evidence through the testimony of Agent Kidd. Furthermore, the judge instructed the jury that the evidence did not include the statements of the attorneys and that the jurors alone must weigh the credibility of the evidence.

Based on Watts's confession and the strength of the corroborative evidence introduced by the government's expert witness, "it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" even in the absence of the prosecutor's statements. *See United States v. Roberts*, 986 F.2d 1026, 1032 (6th Cir. 1993) (rejecting a claim of prosecutorial misconduct where the prosecutor improperly appealed to the community conscience during his closing argument because the evidence against the defendant was overwhelming). This is not a case where "the prosecutor's actions 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

We therefore conclude that the statements made by the prosecutor were not so flagrant as to warrant reversal, even if we were to assume for the sake of argument that they were improper. The remote possibility of either prejudice to Watts or jury confusion, combined with the strength of the evidence against him, significantly outweigh the argument that the prosecutor's statements were extensive and deliberate.

## III.  CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.