**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0288n.06
Filed: April 16, 2009

**No. 06-4662**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| Plaintiff-Appellee, | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| v. | ) | |
| | ) | |
| JEREMY JOSIC, | ) | |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |

BEFORE:    KEITH, SUTTON, and GRIFFIN, Circuit Judges.

KEITH, Circuit Judge.  Now before our court is an appeal by Defendant Jeremy Josic ("Josic") of his conviction and sentence for conspiracy to commit mail fraud, mail fraud, conspiracy to launder money, and money laundering.  He challenges several issues on appeal, including:  (1) jury instructions concerning testimonial immunity, potential bias and the use of a co-defendant's guilty plea during trial; (2) the calculation of intended loss for sentencing purposes, and the alleged imposition of an unreasonable sentence; (3) the denial of a motion for acquittal as to mail fraud; (4) the district court's decision to poll the jury about a mistake in several of the verdict forms; and (5) an ineffective assistance of trial counsel claim.  For the reasons that follow, we uphold the jury's verdict and affirm the sentence imposed.

## I. BACKGROUND

### A. Factual Background

The facts, as outlined in the indictment, and found to be true by the jury based on its guilty verdict, are as follows:

From at least March 1999, Jeremy Josic and his brother, Daniel Josic (the "Defendants"), who were later aided by Donna Bombard,[1] undertook a scheme to defraud various persons across the United States by falsely offering a work-at-home business. Defendants sent mass mailings of fliers, alleging that certain businesses would pay individuals between $5 and $10 for each envelope stuffed and mailed, or booklet stapled.[2] As part of the scheme to defraud, Defendants would use different business names in order to avoid growing complaints against any one company.[3] Defendants structured their enterprise so that persons interested in the work-at-home business had to pay an "application fee" up front before receiving materials to stuff the envelopes or to staple the

---

[1]Donna Bombard testified that she was involved in the operation with Daniel and Jeremy Josic, the purpose of which was to mail fliers to potential customers, who would send in money if they were interested in preparing envelopes. In 1999, Donna Bombard packaged boxes for Josic. At the beginning of 2000, she stuffed envelopes for Daniel Josic, and in October of 2000, she began to handle phone calls.

[2]Kimberly Burbank-Pye testified at trial that she sold lists of names and addresses to Daniel and Jeremy Josic. Appolluna Demmers testified that she owned a company that did graphic design, printing, and mailings of fliers for Josic.

[3]Such names included: Central Communications; Avon Communications; Rainbow Publications; Lakeside Publications; Ocean Publishing; Avon Publishing; Horizon Publishing; Monitor Publishing; Omni Publishing; Able Publishing; Acme Publishing; ABC Publishing; Griffin Enterprises; Consumer Publishing; Apex Publishing; KLM Publishing; Global Consumer Information; Financial Publishing; and D.J. Company.

booklets. Defendants sent some materials to persons who paid the application fee but never intended to pay anyone for the advertised services.  Instead, their intent was to collect application fees from individuals enticed to participate in the business.

At trial, the Government called 16 witnesses.  Seven of those witnesses were individuals who had responded to the advertisements.  Yvette Rhoads, for example, who lived in Corydon, Indiana, in September 2001, responded to a flier she received in the mail from Monitor Publishing offering to pay her $10 for each envelope she prepared and sent.  To participate, she was required to fill out a form and mail in a check for $169, which she did.  Afterwards, she received an incomplete package of supplies from which she prepared and mailed envelopes.  She never received any money for her work and incurred a net loss of $183 as a result of the scheme, $169 in application fees and shipping and handling for the package and $34 in postage used to send the envelopes.

Karla Clark from Wayne, Oklahoma, also received a flier, stating that she could earn money stuffing envelopes for Horizon Publishing.  In response, she sent a money order for $169, and subsequently, received materials from the company requiring her to purchase postage and mailing lists.  She called a number listed on the flier to inform the company that it had sent her the wrong package.  Ms. Clark was told by someone she was unable to identify at trial that the right materials would be sent.  She received the "wrong" package two more times.  She eventually mailed the final package of materials back, after having stuffed the envelopes and affixing postage, but never received a refund.  She was told she could not get money back for stuffing the wrong envelopes. Other individuals testified at trial to similar experiences, including:  James Milam, Eric Brackett, Kimberly Beasley, David Casey, Karen Woods, and Pamela Pack.

Daniel and Jeremy Josic collected at least $2 million during the period roughly between March 1999 and June 2003. To hide the money received from this scheme, Josic and his brother opened at least fifteen checking accounts, over the course of four years, registered to the various company names used by the brothers in the scheme. Steve Bolz ("Bolz"), a postal inspector who investigates mail fraud complaints, examined all of these bank accounts, compiling two spreadsheets that documented checks and other monies deposited from March 1999 until June 2003. One spreadsheet demonstrated deposits of over $3 million in eight different bank accounts, some of which were opened by Josic and others by his brother. After accounting for potential redeposits, Bolz estimated the accounts tallied to a net amount of $2.57 million. Bolz also documented seven additional checking accounts found post-indictment that were related to the scheme. These additional accounts contained deposits of $945,736.05.

Bolz identified thousands of potential victims and obtained copies of over 7,000 checks deposited into the subject bank accounts. Bolz testified that he contacted many of the people who wrote these deposited checks to find out why they had been written, which is how he determined that the bank accounts contained "victim" checks. In his sampling of more than 7000 deposit slips, Bolz testified that he did not ever recall seeing a deposit that was not a victim check. Anything that did not appear to be a victim's check, appeared to be a re-deposit from another account, where other victims' check deposits were kept.

## B. Procedural Background

On December 14, 2005, Josic along with his brother were indicted on eighteen counts, including: conspiracy to commit mail fraud, 18 U.S.C. § 371, mail fraud, 18 U.S.C. § 1341,

conspiracy to launder money, 18 U.S.C. § 1956(h), and money laundering, 18 U.S.C. § 1956(a)(1)(A).  Donna Bombard, who had a lesser role in the offense, was indicted on fewer counts. Daniel Josic and Donna Bombard pleaded guilty to the charges against them.  Josic did not.

Josic's jury trial commenced on August 28, 2006, and concluded on September 1, 2006, when the jury returned a guilty verdict on all eighteen counts, and ordered Josic to forfeit $786,000.00.  He was ultimately sentenced to 60 months in prison on count 1, and 97 months in prison on counts 2-18 to run concurrently.  The court constructed what it called a "reasonable estimate" and found the loss from the scheme to be in excess of $2.5 million, but not more than $2.7 million.

Josic timely appeals.

## II. ANALYSIS

### A. Jury Instructions

To begin, Josic challenges what he considers an erroneous jury instruction concerning the use of his co-defendants' guilty pleas, and the alleged failure of the district court to inform the jury that his brother had testimonial immunity, and was testifying against Josic before the same judge who would later sentence him.

We review these challenges for plain error, pursuant to Fed. R. Crim. P. 52(b), because defense counsel failed to timely object to these alleged errors during trial.  *See United States v. Stover*, 474 F.3d 904, 913 (6th Cir. 2007); *United States v. Maliszewski*, 161 F.3d 992, 1003 (6th Cir. 1998).  Four factors must be met before we can hold there has been plain error.  There must be: (1) error; (2) that is plain; and (3) that affects substantial rights. *Stover*, 474 F.3d at 913.  If all three

factors are met, then the court "may exercise its discretion to notice a forfeited error," if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citations and internal quotation marks omitted); *see also United States v. Christian*, 786 F.2d 203, 214 (6th Cir. 1986) (stating that "[i]n the absence of a request by defense counsel for a limiting instruction, the failure of the trial court to give one is not reversible error," unless it occurs in conjunction with other aggravating circumstances exacerbating the prejudice, and fails to protect the substantive rights of the accused) (multiple citations omitted).

Josic asserts that the district court erred in failing to inform the jury that his co-defendants' guilty pleas were not evidence of his guilt. "[A] guilty plea of a codefendant may not be received as substantive evidence of a codefendant's guilt, but may properly be considered as evidence of a witness' credibility." *Christian*, 786 F.2d at 214; *see also United States v. Martinez,* 430 F.3d 317, 337 (6th Cir. 2005) (same). Here, both Daniel Josic and Donna Bombard were testifying co-defendants who entered guilty pleas in connection with the scheme. The district court offered some caution, stating: "[t]he possible guilt of others is no defense for a criminal charge. Your job is to decide if the government has proved this defendant guilty. Do not let the possible guilt of others influence your decision in any way." That the district court cautioned the jury not to let the guilt of others influence its decision in *any way*, necessarily implied a warning not to use the guilt of others as evidence of Josic's guilt. Josic complains that the instruction did not mention Josic's co-defendants by name nor indicate that the instruction referred to their guilt. This information, however, was transparent, as Daniel Josic and Donna Bombard testified that they were defendants in this case and had entered guilty pleas. The aforementioned jury instruction, in conjunction with

Daniel Josic and Donna Bombard's given testimony, fairly and adequately summarized the issues

and applicable law in this case. *See McMillan v. Castro*, 405 F.3d 405, 413 (6th Cir. 2005) (stating

that appellate courts "review the jury charge as a whole to determine whether it fairly and adequately

submits the issues and the law to the jury") (citations and internal quotation marks omitted). Josic

has therefore failed to demonstrate plain error in this regard.

Josic next claims that the district court erred in failing to inform the jury that his brother had

testimonial immunity, and was testifying against Josic before the same judge who would later

sentence him. This argument also does not compel reversal of Josic's sentence. Even assuming

arguendo that the district court erred in allegedly omitting this jury instruction, any such error failed

to demonstrate plain error because we cannot say with fair assurance that it affected the outcome

of the trial.[4] If the Government's case depended entirely on Daniel Josic's testimony, then a new

trial would perhaps be warranted, as was the case in *Giglio v. United States*, 405 U.S. 150 (1972).

There, a court's failure to inform the jury that the government had promised immunity to its key

---

[4]Josic contends that the Government misstates the fourth prong of the plain error analysis, when it asserts that a "failure to give an immunity instruction . . . was not plain error, inasmuch as it did not affect the outcome of the proceedings." Whether the error affected the outcome of the trial is, however, a critical element in a finding of plain error given the third prong of the plain error analysis. "Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)," which means the error must have affected the outcome of the proceedings. *United States v. Olano*, 507 U.S. 725, 734-35 (1993); *see also United States v. Page*, 232 F.3d 536, 544 (6th Cir. 2000) (citing *Olano*, 507 U.S. at 734, and noting that an "error affects substantial rights when the error was prejudicial, that is, when it 'affected the outcome of the district court proceedings'"). While "[t]here may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome," this does not appear to be one such case. *Olano*, 507 U.S. at 735. Here, we remain unconvinced that Josic did not actually benefit from the jury's ignorance of his brother's testimonial immunity. It is possible any instruction drawing direct attention to Daniel Josic's immunity may have bolstered his credibility as a witness, if the jury interpreted the grant of immunity as sanitizing his testimony.

prosecution witness resulted in a new trial because the Government's case depended almost entirely on the testimony of that witness - "without it there could have been no indictment and no evidence to carry the case to the jury." *Id.* at 154-55. *Giglio* found that this witness's credibility was important, and the jury was entitled to know of any evidence of an understanding or agreement with the Government as to future prosecution that would affect the witness's credibility. *Id.* Here, in contrast, even without the testimony of Daniel Josic, the evidence against Josic was overwhelming. Donna Bombard, an accomplice in the scheme, spoke extensively about working for Josic from 1999 until 2003. Postal Inspector Bolz testified to finding bank accounts, belonging to Josic, in which victim's checks had been deposited. In addition, Appolluna Demmers testified that Josic hired her and her company to prepare the fliers, envelopes and mailings used for various companies later identified as Josic's business fronts. Based on the breadth and depth of available evidence, Josic has failed to demonstrate a reasonable likelihood that a more specific cautionary instruction as to his brother's immunity and bias would have changed the outcome of this case.

**B. Amount of Loss and Sentence Length**

Josic next challenges his sentence, arguing that it was both procedurally and substantively unreasonable. When analyzing the substantive and procedural reasonableness of a sentence, our Court reviews the district court's factual findings for clear error, giving "due deference to the district court's application of the guidelines to the facts." *United States v. Jackson*, 25 F.3d 327, 330 (6th Cir. 1994) (citations and internal quotation marks omitted). Appellate courts are tasked with reviewing all sentences, regardless of whether they are inside or outside of the Guidelines range, under a deferential abuse of discretion standard. *Gall v. United States*, 128 S. Ct. 586, 591 (2007). We must first determine if the district court committed a significant procedural error. *Id.* at 597.

If the sentence is procedurally sound, we must then consider the substantive reasonableness of the sentence under an abuse of discretion standard. *Id.* Additionally, we review *de novo* the district court's method of calculating loss for purposes of enhancing a defendant's sentence under the Guidelines*. United States v. White*, 492 F.3d 380, 414 (6th Cir. 2007).

**1.**

Josic argues that his sentence is procedurally unreasonable because there was an absence of evidence from which the sentencing judge could reasonably support the amount of loss used to calculate his sentence. *See Gall*, 128 S. Ct. at 597 (describing procedural unreasonableness as including "selecting a sentence based on clearly erroneous facts . . ."). More specifically, he asserts that the district court erred by relying entirely on the spreadsheet of deposits compiled by Bolz of the bank accounts found pre-indictment, because Bolz did not inspect every deposit included in said spreadsheet. Josic contends that the district court should have instead relied on any of the following figures to determine the amount of loss from the scheme for sentencing purposes: (1) the jury determination that Josic must forfeit $786,000.00; (2) the prosecutor's argument that Josic was responsible for $1 million in losses; or (3) the stipulation in co-defendant Daniel Josic's plea agreement to a loss amount of $2 million. Josic fails to cite any precedent, nor is there likely any, that demonstrates these figures are the appropriate ones to be used in assessing loss for sentencing purposes.

Instead, the sentencing judge "is in a unique position to assess the evidence and estimate the loss based upon that evidence." U.S.S.G. § 2B1.1 cmt. 3(C). He or she is tasked with determining a "reasonable estimate of the loss," based on a set of concrete variables. *Id*. "The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable

under the circumstances, factors such as the following . . . [t]he approximate number of victims multiplied by the average loss to each victim . . . [and] more general factors, such as the scope and duration of the offense . . . ." *Id.*; *see also United States v. White,* 492 F.3d at 416-17 (stating "[w]e remain mindful of the nature of complex fraud schemes . . . loss need not be determined with precision," and adopting the "net gain method for calculating loss" in the context of medicare fraud) (citations and internal quotation marks omitted).

In this case, the sentencing judge was presented with evidence of loss in the spreadsheets provided by Bolz. Bolz accessed 6,059 victim checks from the eight accounts presented at trial, and 1,011 checks from the seven additional accounts found post-indictment. While Bolz admitted that he could have asked for all of the deposit slips, and received them from the banks, there were an estimated 25,000 to 30,000 victims in this case,[5] making such an undertaking impracticable. Josic has failed to demonstrate why we should view Bolz's testimony as unreliable, aside from his failure to review 25,000 - 30,000 checks instead of the 7,000 he obtained. *See United States v. Brown*, 2009 U.S. App. LEXIS 6384, at *10 (6th Cir. 2009) (unpublished) (considering claims in a loss calculation because they were submitted pursuant to the "same particular and regular billing pattern" as other fraudulent health insurance claims). Having no basis to conclude otherwise, we find the district court did not clearly err in partially relying on Bolz's testimony in determining loss.

Relying on Bolz's testimony and testimony from Donna Bombard concerning the extent of the mailings and intent to defraud, and finding it impossible to determine the exact "actual"[6] or

---

[5]Josic contested this estimate at the trial level, but not on appeal.

[6]Under the advisory sentencing Guidelines, actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. 3(A)(i).

"intended"[7] loss figure "because the number of persons who were victims in this scheme would be almost impossible to identify," the sentencing judge made a "reasonable estimation," using the estimated total number of victims and the application fees, which ranged from $26 to $169. At an approximate average loss of $100 per victim, an amount uncontested by either party, the sentencing judge found the resulting total loss to be about $3 million. The sentencing judge then discounted the loss for some purportedly "legitimate" dealings from possibly legitimate employment, and for estimated redeposits.[8] Ultimately, the district court held:

> the Court need only make a reasonable estimate of the loss, and it is not speculation when we heard evidence about how many thousands were mailed out and the extent of the advertising, the reasonable sampling of the victims' checks throughout the trial and some more testimony here in Court, and even if you discount some of that, you are still well over that $2.5 million-dollar figure.

Despite the district court's consideration of Josic's legitimate activities, Josic now contends that "[s]ome of the checks could have been related to . . . legitimate activities," and therefore the loss figure is grossly inaccurate. During sentencing, Josic could have presented evidence to demonstrate what, if any, portions of the funds from the subject bank accounts were derived from legitimate sources, but he did not, which suggests that all of this money was derived from the illegal scheme. Moreover, Josic was fortunate that the sentencing judge chose to discount the loss amount for

---

[7]Intended loss "means the pecuniary harm that was intended to result from the offense; and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur . . . ." U.S.S.G. § 2B1.1 cmt. 3(A)(ii).

[8]Josic raises for the first time in his reply brief that the sentencing judge erred by failing to account for any refunds given, and by failing to subtract said refunds from the amount of loss. This argument is waived on appeal because it is being raised for the first time in Josic's reply brief. *See LoCoco v. Medical Sav. Ins. Co.*, 530 F.3d 442, 451 (6th Cir. 2008).

potentially "legitimate" endeavors, even though the sentencing judge had not "really heard this discussed."

Given the scope and complexity of the scheme, the impossibility of determining an exact figure, and the lack of clear error in the judge's factual findings, we find no abuse of discretion in the sentencing judge's calculation of loss for sentencing purposes.

**2.**

Next, Josic argues that his sentence is unreasonable because it failed to comply with the requirement under 18 U.S.C. § 3553(a) that a sentencing court must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A district court is mandated to "'impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in' § 3553(a)(2)." *United States v. Bolden*, 479 F.3d 455, 467 (6th Cir. 2007) (quoting 18 U.S.C. § 3553(a)). Josic rests his claim on the "much harsher sentence" he received as compared to his co-defendants. Daniel Josic received 55 months in prison on all counts to be served concurrently, and Donna Bombard received five months in prison and five months of electronically-monitored home confinement. Josic received 60 months on count 1 and 97 months on counts 2-18 to be served concurrently.

There is no basis on which to find that the district court abused its discretion in sentencing Josic. Daniel Josic received a lesser sentence than Josic, because of his "plea agreement, his willingness to plead guilty, his testimony at trial . . . . " Donna Bombard received a much lower sentence due to her "minor role . . . her lower level [of] involvement in this case." She, therefore, did not engage in the same criminal conduct as Josic, and cannot be used to gauge the reasonableness of his sentence. Josic's argument that his sentence length is unreasonable in

comparison to his co-defendants' sentences is wholly without merit, as the disparate sentences were the result of legitimate variables. *See Gall*, 128 S. Ct. at 600 (finding it reasonable to consider the need to avoid unwarranted disparities and "the need to avoid unwarranted *similarities* among . . . co-conspirators who were not similarly situated") (emphasis in original).

**C. Motion for Acquittal**

Josic brought a motion for acquittal on all counts during trial. He asserts on appeal that he should have been acquitted of counts 4, 6, 7, and 10 for mail fraud against Heidi Peck, Larry Muradian, Paul Kettle and Nicole Cook.[9] Josic claims there is insufficient evidence from which the jury could find that the money deposited from checks written by the aforementioned individuals was not for a legitimate transaction, and that there is an absence of proof, as to these four individuals, that the mail was used in furtherance of the scheme. The elements of mail fraud, under 18 U.S.C. § 1341, include: (1) a scheme or artifice to defraud; (2) use of mails in furtherance of the scheme; and (3) intent to deprive the victim of money or property. *United States v. McAuliffe*, 490 F.3d 526, 532 (6th Cir. 2007). We are to review claims of insufficient evidence pursuant to Fed. R. Crim. P. 29, asking "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009).

---

[9]The indictment listed Nicole Cook as the victim in count 10. However, upon review of the record, she actually signed her name Nicole Potter using a check from a joint account also listing a Daniel Cook.

Here, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found more than sufficient evidence to convict Josic of counts 4, 6, 7, and 10, despite Josic's contention that the evidence was insufficient as to those victims because they failed to testify. "[C]ircumstantial evidence alone, if substantial and competent, may support" a guilty verdict "and need not remove every reasonable hypothesis except that of guilt." *United States v. Rayborn*, 495 F.3d 328, 338 (6th Cir. 2007) (citations and internal quotation marks omitted); *see also United States v. White*, 932 F.2d 588, 590 (6th Cir. 1991) (stating that "circumstantial evidence may support a guilty verdict, even if the circumstantial evidence is inconclusive") (citation omitted). In the same fashion as the witnesses who testified at trial, the checks and money orders issued by the non-testifying victims were deposited into an Ohio Savings Bank registered to Omni Publishing, and were paid in amounts requested in the fraudulent fliers. The checks were also written to the order of either Horizon Publishing or Monitor Publishing, two assumed names used in the scheme. Additionally, this circumstantial evidence was bolstered by testimony from those victims, who identified the fraudulent fliers during trial, and explained why and how they sent their money to Josic and his brother. *See Brown*, 2009 U.S. App. LEXIS 6384, at *10. In response to Josic's contention that there was an absence of evidence that the checks were not part of "some sort of legitimate transaction," we are not required to remove every hypothesis except that of guilt, even reasonable hypotheses. Here, there was more than enough circumstantial evidence from which a jury could convict Josic.

Josic's next argument that there was insufficient evidence available to prove that the mail was used to further the scheme is meritless. Again, circumstantial evidence is sufficient to support a guilty verdict and it is enough for the prosecution to demonstrate that the fraudulent company

-14-

routinely used the postal service in order to satisfy this challenged element of mail fraud. *United States v. Wall*, 130 F.3d 739, 743 (6th Cir. 1997) (noting that "[t]estimony regarding a company's routine use of the postal service is sufficient circumstantial evidence to prove use of the U.S. mail") (citing *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994)).  In this case, fliers related to the scheme were introduced into evidence that directed "applicants" to send their completed forms and fees to an address in Ohio.  Additionally, numerous victims testified to mailing their application fees to the addresses listed in the fraudulent fliers, and both Donna Bombard and Daniel Josic testified that as part of the scheme they routinely used the mail.  This is sufficient evidence from which the jury could find that the challenged element was satisfied.  The trial court did not err in denying Josic's motion for acquittal.

**D. Jury Poll**

Josic next contends that the district court erred, pursuant to Fed. R. Evid. 606(b),[10] when the judge polled the jury about whether it intended to find Josic guilty of money laundering or conspiracy, after finding a mistake on the jury form.  Our Court reviews all evidentiary rulings under the abuse of discretion standard.  *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003), *cert denied*, 540 U.S. 973 (2003).  "An abuse of discretion will be found upon a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (citations and internal quotation marks omitted).  Our

---

[10]Fed. R. Evid. 606(b), states in part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations . . . or concerning the juror's mental processes in connection therewith.

Court will only reverse an evidentiary decision when we find that such abuse of discretion has caused more than harmless error. *United States v. Johnson*, 440 F.3d 832, 847 (6th Cir. 2006). The verdict forms for counts 15-18 stated "Money Laundering" in the caption but "Conspiracy" in the text. Josic asserts that polling the jury about whether they meant to convict him of conspiracy or money laundering sought the jury's "thought processes."

Our Court has found it acceptable to poll a jury about a verdict, so long as it is only to clarify the final award or verdict, and not to inquire into the jury's thought processes. *McCullough v. Consol. Rail Corp.*, 937 F.2d 1167, 1172 (6th Cir. 1991) (finding it acceptable for a judge to poll the jury when the inquiry was limited to whether the jury intended an award of $235,000 or $235,000 minus fifty percent). This is particularly appropriate when only minutes have elapsed from the announcement of the award, all jurors are unanimous that there has been a mistake, and the inquiry is limited to only one question. *Id.* Here, no time elapsed between the announcement of the verdict and the poll, since the judge discovered the error while he was in the process of reading the verdict. The district court judge then limited his inquiry to the following question, which he asked each juror: "I want to clarify . . . that the money laundering counts are what you, the jury, has deliberated on and entered a verdict of guilty on?" The jury was unanimous in its intent to find Josic guilty of money laundering rather than conspiracy. Additionally, the jurors had been instructed before they entered deliberations that counts 15-18 were laundering offenses, and had been instructed as to the elements for money laundering. Accordingly, the district court did not abuse its discretion in polling the jury, as the poll merely sought clarification.

**E. Ineffective Assistance of Counsel**

Josic additionally asserts that he received ineffective assistance of counsel, because his counsel: (1) failed to inform the jury that Daniel Josic had immunity and was scheduled to be sentenced before the same judge; (2) failed to caution the jury about Josic's co-defendants' guilty pleas; (3) relied on a vacated Sixth Circuit case, *United States v. Vonner*, 452 F.3d 560 (6th Cir. 2006), during sentencing; (4) failed to explain the defense's trial exhibits to the jury; and (5) failed to object to the trial judge's decision to poll the jury about a mistake in the jury form.

Generally, our Court will not review an ineffective assistance of counsel claim brought for the first time on direct appeal, "since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990); *United States v. Atwell*, 1998 U.S. App. LEXIS 1315, at *4 (6th Cir. Jan. 27, 1998) (unpublished). When "the record is adequate to assess the merits of the defendant's allegations, some courts will consider them," leaving us with the discretion to determine whether to hear an adequately developed record on direct appeal. *Wunder*, 919 F.2d at 37. In this case, we are not compelled to depart from our general practice, particularly since we have found the other grounds on which Josic seeks to have his verdict vacated and his sentence reversed to be meritless. *See Massaro v. United States*, 538 U.S. 500, 508-09 (2003) (discussing cases where it may be advisable to raise an issue on direct appeal, such as where trial counsel's ineffectiveness is so apparent from the record or when obvious deficiencies compel the appellate court to address the issue *sua sponte*). Josic can still raise his ineffective assistance of counsel claim in a proper post-conviction hearing, even though we decline to hear it here. *Wunder*, 919 F.2d at 37.

### III. CONCLUSION

-17-

Accordingly, for the reasons stated above, we uphold the jury's verdict and affirm the sentence imposed.